IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Marilyn Hardt, | ) | No. CV 05-494-TUC-CKJ (HCE) |
| | ) | |
| Plaintiff, | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| vs. | ) | |
| | ) | |
| Michael J. Astrue,[1] Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

On August 12, 2005, Plaintiff filed the instant *pro se* action seeking review of the final

decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g).  On that

same date, Plaintiff's case was referred to the undersigned Magistrate Judge for a Report &

Recommendation pursuant to the Rules of Practice of this Court.

Pending before the Court are the parties' Cross-Motions for Summary Judgment.  For

the following reasons, the Magistrate Judge recommends that the District Court grant

Plaintiff's Motion for Summary Judgment (hereinafter "Plaintiff's MSJ") and deny

Defendant's Cross-Motion for Summary Judgment (hereinafter "Defendant's XMSJ").

I.      PROCEDURAL HISTORY

On September 18, 2002, Plaintiff submitted to the Social Security Administration

(hereinafter "SSA") an application for disability insurance benefits under Title II of the

_____

[1]On February 12, 2007, Michael J. Astrue was sworn in as the Commissioner of
Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael
J. Astrue is substituted as the defendant in this action.

Social Security Act alleging inability to work since September 7, 2001[2] due to multiple chemical sensitivity and mold allergy.  (TR. 71–73, 81)  Plaintiff's application was denied initially and on reconsideration. (TR. 40-43, 47-49)

Plaintiff then requested a hearing before an administrative law judge (hereinafter "ALJ") and the matter came on for hearing on January 22, 2004 before ALJ Norman R. Buls. (TR. 50-54, 596-621)  Plaintiff, who was represented by counsel at the hearing, was the only witness to testify.  On June 18, 2004, the ALJ found that Plaintiff was not disabled as defined in the Social Security Act. (TR. 23-29)

Plaintiff requested that the Appeals Council review the ALJ's decision.  (TR. 9, 19)  The Appeals Council, after considering additional evidence submitted by Plaintiff, denied Plaintiff's request for review thereby rendering the ALJ's June 18, 2004 decision the final decision of the Commissioner.  (TR. 11-15)  Plaintiff's subsequent request for the Appeals Council to reopen the matter was denied.  (TR. 7-8) Plaintiff then initiated the instant action.

II.     THE RECORD ON APPEAL

A.     Plaintiff's general background and Plaintiff's statements in the record

Plaintiff was born on March 12, 1951.  (TR. 76)  Plaintiff is married but she does not live with her husband.  (TR. 599-600) She has two adult sons.  (TR. 98, 108, 599) At the time of the hearing, Plaintiff lived in a house by herself.  (TR. 600)

Plaintiff has a Bachelor of Science degree and a Master of Science degree both in speech pathology, national certification in speech pathology, elementary education certification and is a reading specialist.  (TR. 87, 599-600, 615) Plaintiff worked as a speech pathologist from 1973 to 2001.  (TR. 90, 607) Plaintiff's work "was a very physically demanding job."  (TR. 608) "At the beginning of every year" she had to carry a 14-pound audiometer.  (TR. 607)   She frequently lifted up to 10 pounds and the heaviest weight she lifted was 20 pounds.  (TR. 82)  She had to travel from school to school, plan lessons, gather

--------

[2]The onset date was later amended to May of 2001.  (TR. 621)

materials, meet with parents and teachers, and escort children to the classroom which often required climbing two-and-one-half flights of stairs. (TR. 82, 607-608) She also had to carry materials and equipment from school to school. (TR. 82; *see also* TR. 91) Each day she walked for up to one-third of an hour to one hour; stood up to two hours; sat up to two hours; crouched up to one-half hour; and wrote, typed or handled small objects up to one hour. (Id.)

Plaintiff stopped working because she "was no longer able to fulfill [her] duties as a teacher." (TR. 600) She "was extremely tired and in pain...Some days I would be able to go to work and just barely make it home. I'd be nauseated. We'd have to stop the car several times before I could get home." (TR. 601) Upon arriving home, she would sleep until it was time to go to work the next day. (Id.) She felt pain in her head, neck, shoulders and low back. (Id., TR. 101) Often the pain radiated down her left leg or into her left hand. (TR. 601) "It will become so intense at times, all I can do is lie in a dark room, put ice on my head,...take the pain medication...but even...that irritates my stomach and I end up being nauseated and vomiting blood." (TR. 601) She often experiences dizziness and sometimes faints while bathing. (TR. 99, 107, 613) Plaintiff attributes her symptoms to allergies to toxins in food, buildings, and the air. (TR. 602) When her allergies are triggered, she also experiences confusion, difficulty concentrating, memory loss, depression, migraines, and spasms throughout her body. (TR. 103, 111, 601, 608, 612) When she enters certain buildings, she experiences shortness of breath, chest pain, dizziness, burning in her nose, hoarseness, and a rapid heartbeat. (TR. 602, 617) Before she stopped working completely, her symptoms caused her to miss a significant amount of work. (TR. 610-611) She would spend "a couple days a week in bed with head pain, neck pain. I would go to the chiropractor. I would feel okay for a couple days then it would just start back over again." (TR. 611-612)

Exposure to mold, pollen, stress, and petrochemical products causes her symptoms. (TR. 105, 111) She tries to avoid certain substances and locations that she finds causes her allergies such as: chemicals, pesticides, herbicides, perfume, laundry detergent, and certain

"buildings themselves" that cause her eyes and nose to burn when she approaches them. (TR. 617)  "Sometimes I can leave and I will be okay, be marginal the next day, but sometimes it just goes into like a whole cascade of symptoms and then I just end up with migraines and muscle spasms again and get nauseated."  (TR. 617)  When it rains, she stays in her room with the air filter running.  (Id.)

Plaintiff first began to experience the symptoms when she was living and working in Pennsylvania.  (TR. 612-614) Since she stopped working, she learned that all of the schools where she had been working were closed for a period due to mold.  (TR. 608) Her symptoms caused her to move from the renovated farm house where she was living with her husband and to live with her mother at a senior citizens' apartment home.  (TR. 613) By the end of September 2002, "[t]he place where I was living...put fertilizer all over the grass.  I was throwing up blood and I though I have to get out of here...I'm not eating.  I can't take care of myself."  (TR. 614)  In October of 2002, Plaintiff moved to Arizona "and started to feel better."  (Id.)  In her June 1, 2003 Activities of Daily Living Questionnaire, Plaintiff wrote: "I love my family but it came to a choice of breathing or not breathing.  I choose breathing!...I no longer visit.  I live by myself in [sic] high mountain desert so I can breathe and be relatively pain free and think.  The mold effects [sic] my cognitive functioning."  (TR. 108) Plaintiff also stated that since moving to Arizona, her "[m]uscle and joint pain is less...than living in the cold and damp of Pennsylvania but continues to interfere with activities of daily living.  I continue to experience pain, fatigue and weakness."  (TR. 500)

Plaintiff also suffers from arthritis of the spine and scoliosis.  (TR. 114)

Regarding her daily activities, Plaintiff rises at approximately 8:00 a.m., prepares a meal, eats, bathes and gives herself an enema to clean her body of toxins from the night before.  (TR. 603) She eats,[3] reads, watches television, sleeps, walks, and works on her

---

[3]Plaintiff has to "eat very slowly due to the spasms in the esophogus [sic].  If I eat fast, I choke and experience pain through the thorax."  (TR. 101)

breathing pattern throughout the day.  (Id., TR. 108, 620)  She cannot sit for long periods.  (TR. 603, 620)  She cannot walk more than one-half a mile or for longer than one-half hour.  (TR. 605, 620; *see also* TR. 102 (in December 2002, Plaintiff could only walk for fifteen minutes before her low back began to hurt))  Before eating vegetables she must steam them and rinse them in vinegar and water.  (TR. 605)  She pays someone to clean her house.  (Id.)  She cannot push and pull a vacuum cleaner.  (TR. 99)  Plaintiff does not trust her judgement, mental functioning and reflexes to drive and has been in two car accidents since 2001.  (TR. 604, 609-610)  She does her own shopping, but does not spend more than 20 minutes in the store.  (TR. 108, 620)  She has a friend take her shopping or she rides the bus.  (TR. 620)  Plaintiff stated that her son also does shopping.  (TR. 98)  She is no longer able to garden.  (TR. 99)  Since becoming ill, she has stopped jogging, taking long walks, skiing, going to church, the movies, or out to dinner.  (TR. 100)  She also experiences difficulty writing due to hand cramps.  (TR. 101)  She loses bladder control and does not go in public without protective clothing.  (TR. 619)  When she experiences spasms, she does not cook or bathe.  (TR. 113)  On June 4, 2003, Plaintiff reported she was sleeping 20 hours per day.  (Id.)

Plaintiff has taken medications, vitamins and supplements including acetaminophen, aspirin, valium, tylenol, benadryl, miconazole, chloroacetamide, cytamel to regulate her thyroid, cipro, astelin, itraconazole, nasonex, rhinocort, guaifenex, diazepam, diphenhydramine, vioxx, progesterone, buforphanol, imitrex, flurbiprofen, zoloft, zanaflex, vitamin A, potassium, coenzyme Q-10, liquid vitamins and minerals, lactobacillus acidophilus, lactobacillus plantarum, lactobacillus rhamnosus, lactobacillus casel, lactobacillus bulgaricus, s. thermophilus, bifidobacterium longum, bifidobacterium bifidum, "[t]he [w]oman's [o]il", essential oils, and enemas.  (TR. 103, 120-121, 164, 173-174, 197, 257, 601, 618)  Plaintiff has also tried acupressure with essential oils, physical therapy, chiropractic care, biofeedback, used a stimulator unit, hot baths, massage, yoga, herbs, essential oils, and complete diet and lifestyle changes. (TR. 104, 106)  She has experienced side-effects from the medications including nausea, stomach bleeding, dizziness, drowsiness,

- 5 -

constipation, irritability, candida, dried sinuses, and decreased eye sight requiring her to wear two pairs of glasses to read the phone book, (TR. 103, 106, 109, 618) Sleeping, chiropractic care and eliminating the toxic environment alleviates her symptoms. (TR. 106)

In 2002, Plaintiff earned $9,874 which was for a medical sabbatical that Plaintiff "took from work and a disability from Fortis of $100 a month. That was my stipend that I received." (TR. 618-619; *see also* TR. 10)

Plaintiff hopes to return to work. (TR. 114, 615) However, she does not "have the physical stamina to go back to work at this point in time." (TR. 616)

     B.    <u>Medical Evidence</u>

          1.    <u>Plaintiff's Treating Physicians</u>

               a.    <u>Robert M. Pfoff, M.D. and Julie F. Cameron, M.D.</u>

On July 8, 1999, Plaintiff presented to Robert M. Pfoff, M.D., of Pennsylvania Integrated Physician Association, complaining of muscle aches that she had been experiencing for years but had become more prominent and constant. (TR. 174) She recently began physical therapy but it did not relieve her pain. (Id.) She also reported suffering from migraines for which she took Imitrex. (Id.) Six months previously she started taking luvox for depression. (Id.) She experienced perimenopausal symptoms, sleep disruption, and had been told she had scoliosis. (Id.)

Dr. Pfoff's physical examination denoted no clear muscle tenderness or joint swelling. (Id.) His assessment was:

    1.    Chronic recurrent pain in the upper extremities, fits most with a fibromyalgia type picture, although she doesn't have a classic distribution of pressure points.
    2.    Perimenopausal symptoms.

(Id.) Dr. Pfoff ordered further testing and prescribed a natural progesterone cream and a patch. (Id.)

On July 20, 1999, Plaintiff had a follow up appointment with Julie F. Cameron, M.D., also of Pennsylvania Integrated Physician Association. (TR. 173) She reported to Dr.

Cameron that she had been involved in a car accident when she was 16 which resulted in a neck injury. (Id.) Plaintiff also reported experiencing headaches, neck pain, and muscle spasms involving the back of her neck and shoulders. (Id) She went to physical therapy, had neck manipulations and "seemed to do very well until 01/99, when she seemed to have a back slide in her symptoms with increasing muscle spasms of the shoulder girdle, particularly the day after physical therapy or other activities such as gardening." (Id.) When she carries a lot of files for work or "does a particular activity, she often has severe muscle pain the following day." (Id.) "Dr. Pfoff put her on Flurbiprofen to be taken [twice per day]..., but it makes her sleepy so she just takes it at night." (Id.)

Dr. Cameron assessed scoliosis with chronic upper body and neck spasm; and migraine headaches. (Id.) She gave Plaintiff the names of a hypnotherapist and acupuncturist. (Id.) She also prescribed amerge for migraines hoping that it would last longer than the imitrex. (Id.)

In February 2001, Plaintiff saw Dr. Cameron on follow-up. (TR. 172) Plaintiff was experiencing migraines once per month, "they can be very severe and last her 2-3" days. (Id.) She had stopped taking amerge and returned to imitrex for migraines because imitrex worked better. (Id.) She continued with physical therapy, which she felt was "the most helpful." (Id.) She had seen the hypnotherapist Dr. Cameron had previously recommended but had difficulty with scheduling the appointments. (Id.) She also related that in 1992 she was treated for TMJ involving a splint and braces to realign her jaw with "fairly good results". (Id.) "She thinks maybe her symptoms are coming back." (Id.) In addition to imitrex, Plaintiff was taking St. John's Wort, Gingko Biloba, and a "progesterone/yam cream which...[s]he feels...has helped decreased [sic] the incidence of her headaches." (Id.) Dr. Cameron's assessment was scoliosis with muscle spasm and migraines and TMJ syndrome. (Id.) She continued Plaintiff on imitrex and prescribed valium for "severe muscle spasms." (Id.)

Dr. Cameron's progress note from April 11, 2000 denoted that Plaintiff developed severe left hip pain after sitting cross-legged on the floor for thirty minutes at work.  (TR. 171)  Dr. Cameron assessed scoliosis; recurrent hip pain, neck pain and migraines; and depression.  (Id.)  "45 spent [with] pt–more than ½ in direct counseling."  (Id.)  She continued Plaintiff on imitrex, recommended acupuncture and that Plaintiff continue taking St. John's Wort "on regular basis–alternative would be Prozac or similar."  (Id.)

On June 28, 2000, Dr. Cameron noted Plaintiff's complaint that the St. John's Wort was not working; that Plaintiff was taking higher than recommended doses; and that she intended to switch Plaintiff to paxil.  (TR. 170)

Plaintiff saw Dr. Pfoff on October 12, 2000 for complaints of pain in her fingers.  (TR. 169)  His exam of Plaintiff showed "no synovial thickening, perhaps some very minimal degenerative changes.  Good R[ange] O[f] M[otion], normal strength."  (Id.)  He assessed: perimenopausal; hormone related headaches, improved with Progesterone cream, joint complaints, probably degenerative arthritis.  (Id.)  He noted that Plaintiff started supplements including Glucosamine and Chondroitin Sulfate, that taking the chondroitin sulfate was "ok", but he "advised against taking too many other homeopathic remedies."  (Id.)

On August 9, 2001, Plaintiff relayed to Dr. Cameron that a chiropractor told her she had an irregular pulse.  (TR. 167)  Dr. Cameron noted: "Heart has a regular S1 and S2 with frequent prematurity and slight pause.  EKG shows frequent ectopy, some of which appears to be PACs with aberrancy, others are clearly PVCs and there are copulets and they appear to be multi-focal." (Id.)  Dr. Cameron's assessment was "[n]ew onset of PVC."  (Id.)

On August 26, 2001 Plaintiff presented at a hospital emergency room complaining of a "severe episode of chest pain...which she describes as a heaviness in the left chest area radiating into the left arm with a weakness and fatigue of the left arm and a pain in the back as well."  (TR. 144) She also complained of dizziness and shortness of breath although she was not experiencing shortness of breath at that time.  (Id.)  She reported feeling chest pain

for a couple of months.  (Id.)  A stress test, an EKG, and chest  x-rays were normal.  (TR. 140) Plaintiff's discharge diagnoses was chest pain, scoliosis, and depression.  (Id.)

On September 17, 2001, Plaintiff saw Dr. Cameron with complaints of migraines  and severe muscle spasms in her neck.  (TR. 164) Dr. Cameron noted that Plaintiff was "not too kean [sic] on traditional medicine" and has seen chiropractors who told her that certain areas of her cervical spine fall out of alignment.  (Id.)  Plaintiff appeared ill and flushed.  (Id.)  Dr. Cameron's assessment was "[m]igraine headaches, probably aggravated by perimenopause and probably also with a transformed migrainic syndrome...Neck pain aggravating headaches."  (Id.)  She prescribed valium and Tylenol 3 for pain.  (Id.)  She also gave Plaintiff the name of a headache and spine specialist.  (Id.)  Dr. Cameron felt that Plaintiff may benefit from injections. (Id.; *see also* TR. 339)

On November 21, 2001, Charles Caiman, M.D., at the Cleveland Clinic Foundation wrote Dr. Cameron, who had referred Plaintiff to him for thyroid testing.  (TR. 146) His physical examination of Plaintiff denoted a small goiter with the left side being slightly larger than the right.  (Id.)  Test results indicated no underlying thyroid or pituitary disease.  (Id.)  On December 7, 2001, Dr. Cameron noted that a thyroid ultrasound/sonogram indicated a few, "very tiny" nodules and that the gland was not enlarged.  (TR. 159)

In December 2001, Plaintiff underwent an esophagram study for complaints of dysphagia.  (TR. 161-162) In January 2002, Plaintiff had a barium swallow study for complaints of difficulty swallowing large pills.  (TR. 157-158) Test results reported to Dr. Cameron denoted that Plaintiff's esophagus was slightly displaced to the left most likely due to a mass from thyroid enlargement and indicated that tablets did become lodged creating Plaintiff's symptoms.  (TR. 157, 161) It was recommended that Plaintiff crush her pills and that she dry swallow following ingestion of thin liquid or solid food.  (TR. 158)

On July 12, 2002, Plaintiff told Dr. Cameron that she was certain she had multiple sclerosis (hereinafter "M.S.").  (TR. 153) "She uses pendulum questioning.  She takes off her necklace, holds it in her hand and asks a question.  If it goes up and down, the answer is 'yes'

and if it goes right and left the answer is 'no.'... She will put it over foods and medications and it will tell her whether or not she should take it...She is amazed I am not using this method in my medical practice." (Id.) Plaintiff was taking cytomel as prescribed by her allergist for her thyroid. (Id.) She had been waking up with a stiff neck and experiencing muscle cramps and problems with her hands. (Id.) "She was trying to figure out why she is having these symptoms in her arms and legs. She put every disease she could think of on sheets of paper and put it under other sheets of paper so that she could not read them, then put her necklace over it and the ones it said 'no' on she doesn't have. It said 'yes' over M.S. She is certain that she has it." (Id.) On physical examination, Plaintiff's muscle strength was normal and muscles were not tender. (Id.) Dr. Cameron's assessment was muscle cramps and fatigue; possible parathesias with a normal exam; muscle cramps, apparent thyroid problem. (Id.) Dr. Cameron recommended thyroid testing and an MRI of Plaintiff's head to rule out M.S. (Id.) Plaintiff's July 16, 2002 MRI was normal thus denoting no evidence of M.S. (TR. 152)

b.    Milton J. Klein, D.O.

In Pennsylvania, Plaintiff was also treated by physiatrist Milton J. Klein, D.O., from May 2000 through September 2002. (TR. 175-211) On May 25, 2000, Dr. Klein completed an Initial Physical Medicine Evaluation Note regarding Plaintiff, who was 49-years old at the time. (TR. 209) He saw Plaintiff upon referral from Dr. Michael C. Mazzocco for her complaints of headaches which "are usually related to flares of left hip pain and a secondary thoracolumbar scoliosis. An additional factor is that her headaches are worse when she is premenstrual..." (Id.) Plaintiff reported to Dr. Klein that as a result of a car accident when she was 16, she "sustained a left-sided concussion and right distal humeral fracture..." (Id.) Previously, Plaintiff had been diagnosed with scoliosis, undergone treatment including physical therapy and use of a custom nasopharyngeal orthosis for migraines, and a mild disc bulge at the C5-6 level. (Id.)

Dr. Klein's exam revealed "the significant thoracolumbar scoliosis convexed to the left with the apex at L1-2 and significant rotation to the right with right paralumbar muscle spasms.  The patient is demonstrating a right piriformis syndrome as evidenced by palpable tautness of the right piriformis muscle and restricted passive right hip internal rotation compared to normal passive left hip internal rotation."  (TR. 210)  His impression was recurrent predominantly left-sided headaches secondary to underlying musculoskeletal etiologies; left TMJ dysfunction; osteopathic somatic dysfunction of the lumbosacral spine and cervical-dorsal spine; and thoracolumbar scoliosis-idiopathic.  (Id.)  He recommended continued physical therapy and current medication regimen, which included imitrex for migraines and florbiprofen [sic] an anti-inflammatory.  (Id., *see also* TR. 209) He treated Plaintiff with a combination of gentle osteopathic myofascial release technique and osteopathic muscle energy technique.  (TR. 210) Plaintiff responded well to the treatment. (Id.)

Plaintiff saw Dr. Klein through June 2001 for continued complaints of pain, muscle spasm, and sleep disturbance. (TR. 191-202, 207-208) Dr. Klein advised Plaintiff to continue medication regimen prescribed by other doctors; to continue with her home self-treatment program including therapeutic exercise and stretching;  prescribed an Allwave Neuromuscular  Stimulator (hereinafter "stimulator unit"); gave her samples of anti-inflammatory medications such as celebrex, vioxx, and recommended Plaintiff continue with physical therapy; use a sacral-support orthosis belt;  and also try yoga.  (Id.) Dr. Klein treated Plaintiff with osteopathic manipulation techniques.  (Id.)  He noted that Plaintiff "remains highly motivated."  (TR. 196)

At an August 28, 2001 appointment Plaintiff, who had been off work for the past two months for summer vacation and was scheduled to return to work on August 29, 2001, expressed to Dr. Klein her concerns "regarding resumption of usual occupational duties....The patient is concerned regarding her ability to work on a regular day-to-day basis because her musculoskeletal symptoms have become somewhat worse."  (TR. 188, 192) On

physical examination, Plaintiff demonstrated "chronic right cervical-dorsal compensatory pattern and similarly right-sided lumbosacral compensatory pattern.  However, the left piriformis muscle is more taught [sic].   The patient also demonstrates somatic dysfunction at T11-12 on the right."  (Id.)  Dr. Klein's impression was: migraine headaches secondary to underlying musculoskeletal etiology (intermittent flaring); osteopathic somatic dysfunction of the lumbosacral spine and cervical-dorsal spine with chronic compensatory pattern on the right (intermittent flaring); and idiopathic thoracolumbar scoliosis (stable).  (Id.)  He recommended that Plaintiff "remain off work until further notice.  She has available sick days up to 10/02/01.  Thereafter, she will have to apply for disability benefits."  (Id.)  Dr. Klein treated Plaintiff with osteopathic manipulation and noted that "[s]he remains highly motivated."  (TR. 189)

Dr. Klein's September 24, 2001 Follow-Up Visit Note denoted that Plaintiff had been off work since September 10, 2001 "because of recurrent musculoskeletal pain."  (TR. 187) He indicated that Plaintiff had scheduled a rheumatology consultation at Cleveland Clinic Foundation in October and that since her last appointment with him, Plaintiff had seen a chiropractor whose manipulative therapy provided temporary relief.  (Id.)  On physical examination, Plaintiff exhibited "[t]he previously-noted chronic right cervical dorsal and right lumbosacral compensatory pattern remains stable."  (Id.)  He treated Plaintiff with osteopathic manipulation.  (Id.) Dr. Klein stated that Plaintiff was "to remain off work until further notice."  (Id.)

Plaintiff returned for follow-up on November 1, 2001 and December 17, 2001.  (TR. 185-186) At the December 17, 2001 appointment, Dr. Klein indicated that "[t]here was some anticipation of her returning to gainful employment as of January 2nd, 2002; however, her musculoskeletal status remains unchanged and there continues to be some medical problems that require workup [sic]."  (TR. 185) He also noted that Plaintiff was being seen elsewhere for an  esophageal abnormality.  (Id.)  On physical examination, Dr. Klein found that Plaintiff's "thoracolumbar scoliosis is problematic with an associated right concavity at the

thoracolumbar junction.  There is continuing evidence of chronic compensatory pattern of both the right cervical-dorsal and right lumbosacral regions." (Id.) Dr. Klein treated Plaintiff with osteopathic manipulation.  (Id.) Dr. Klein recommended that Plaintiff "remain off work until further notice" and he provided her with written authorization to remain off work "for the next four months, the period of January 2nd, 2002, through April 30, 2002....As the patient is stabilizing, she is scheduled to return in a six-week physician follow-up visit dated January 28, 2002, or sooner if necessary."  (Id.)

At a February 4, 2002 appointment, Dr. Klein again stated that Plaintiff was to remain off work.  (TR. 184) He continued Plaintiff on physical therapy and prescribed medications. (Id.)  Dr. Klein treated Plaintiff with osteopathic manipulation.  (Id.)

On March 19, 2002, Dr. Klein noted that Plaintiff had

discontinued living at home as of a month ago because of a significant allergy to mold.   At [sic] her residence is an old farmhouse, and it would be impossible to correct this situation, and therefore, the patient lives in an apartment.  She is less symptomatic with regard to chronic sinusitis and her musculoskeletal symptoms are also improved.  She is receiving some treatment from a polarity therapist.

(TR. 183)  He stated that Plaintiff "remains off work; however, it is expected she will return to gainful occupational duties as of May 1, 2002."  (Id.)  Physical examination reflected "continuing left cervical-dorsal and left lumbosacral compensatory pattern with an associated left piriformis syndrome."  (Id.)  Dr. Klein treated Plaintiff with osteopathic manipulation. (Id.) He recommended that Plaintiff "remain off work until her scheduled return to gainful employment date of May 1, 2002."  (Id.)

On April 16, 2002, Dr. Klein provided Plaintiff with a note directing her to remain off work until June 30, 2002.  (TR. 182) He indicated Plaintiff's report that her mold allergy was unresponsive to desensitization injections "which are performed weekly by the patient" and that she was scheduled for allergy follow up with Dr. Kerry.  (Id.)  On physical examination, Plaintiff demonstrated "a predominantly right-sided compensatory pattern of both the

cervicodorsal [sic] junction and right sacroiliac joint." (Id.) His impression remained the same as indicated on previous visits.

On May 20, 2002, Plaintiff returned to Dr. Klein with complaints of upper cervical muscle tension with associated TMJ dysfunction. (TR. 181) He indicated that "[s]he remains stable with continuing right cervical dorsal and right lumbosacral musculoskeletal pain/dysfunction." (Id.) Dr. Klein treated Plaintiff with osteopathic manipulation. (Id.) He advised Plaintiff "to continue chiropractic care as needed and the allergy program with regard to mold allergy by Dr. Kelly[4]...She is to remain off work until further notice. However, she is covered for work disability until 06/30/2002...She is to continue her regular home stretching program and activities as tolerated." (Id.)

On June 17, 2002, Plaintiff told Dr. Klein that her pain remained predominantly left-sided; she was having difficulty with environmental allergens such as mold; she was avoiding dairy products, wheat and sugar; and she was going to apply "for a medical sabbatical, which would provide her with half-pay for one year. She is expected to return to her educational duties as of August 19, 2002." (TR. 179) Dr. Klein also noted that Plaintiff "remains work disabled due to a combination of her musculoskeletal problems and the associated environmental allergies to mold and Formaldehyde-derived products." (Id.) His recommendations included that Plaintiff was "to continue activities as tolerated, regular chiropractic care, and the allergy program with Dr. Kelly...The patient is to remain off work until further notice, and she will be applying for a medical sabbatical for one year." (TR. 179-180).

On July 15, 2002, Plaintiff complained of recurrent headaches and pain radiating to her left eye. (TR. 177) She told Dr. Klein that she was applying for a one-year medical sabbatical "because of her continuing difficulty due to mold allergies and musculoskeletal

---

[4]Dr. Klein also noted that Dr. Kerry had prescribed cytomel. (TR. 181) "She is also prescribed Astelin nasal spray and topical progesterone for menopausal symptoms." (Id.)

impairment." (Id.) Dr. Klein noted on physical examination that in addition to chronic right-sided compensatory pattern in both the cervical-dorsal and lumbosacral regions, Plaintiff also demonstrated "chronic soft tissue texture abnormality, which is predominantly right sided." (Id.)  His impression did not change from previous visits.  (Id.)  Dr. Klein treated Plaintiff with osteopathic manipulation.  (Id.) He also prescribed topical flexeril for recurrent cervical muscle spasm and advised her to continue "her medical follow-up", chiropractic care, medication regimen as needed and to remain off work.  (Id.)

On August 12, 2002, Plaintiff told Dr.  Klein that she had recently returned from a 12-day trip to Germany which had been led by teachers.  (TR. 176)  While in Germany, Plaintiff received chiropractic treatment and "some proprietary German medication, which sounds like a combination of a nonsteroidal anti[-]inflammatory medication with muscle relaxant.  She found this beneficial."  (Id.)  Plaintiff complained about continued headaches.  (Id.)  Dr. Klein noted that the topical flexeril he had previously recommended was not beneficial to Plaintiff, she remained stable, and was to continue off work.  (Id.)

On September 23, 2002, Plaintiff reported to Dr. Klein that she received a one-year sabbatical beginning August 20, 2002 and which could be extended one year if necessary. (TR. 175) She felt "generalized stiffness and myalgias", was having difficulty with her mold allergy, and was using a nasal spray for "associated intermittent headaches."  (Id.)  Dr. Klein's impression remained unchanged from pervious visits.  (Id.)  He treated Plaintiff with osteopathic manipulation.  (Id.)  His continued Plaintiff on off-work status.  (Id.)

On December 15, 2003, Dr. Klein wrote that he had been treating Plaintiff from May 25, 2000 through May 29, 2003

> for management of chronic axial skeletal pain-cervicodorsal [sic] and lower back pain, left-sided headaches secondary to atypical migraine headaches, and thoracolumbar scoliosis-idiopathic.  The patient is demonstrating multiple findings consistent with a chronic musculoskeletal compensatory pattern for which this physician has been utilizing prescribed medication management and osteopathic manipulative therapy.  The patient remains unimproved, and the osteopathic manipulative therapy is of a palliative nature.

- 15 -

(TR. 310) He opined, "within a reasonable degree of medical certainty" that Plaintiff "remains permanently work disabled due to chronic intractable musculoskeletal impairment, which requires ongoing care." (Id.) He noted that Plaintiff had moved to Arizona and was receiving treatment there. (Id.)

c.      Roy E. Kerry, M.D.

On January 22, 2002, Plaintiff presented at the office of Roy E. Kerry, M.D. of Ear, Nose, Throat & Allergy Associates, P.C., complaining of sinus problems, a stiff neck and a sore throat. (TR. 262, 258-259) Physical examination revealed that her nasal mucosa was "very congested and boggy. It is erythemic in color." (TR. 259) Her thyroid appeared enlarged on the left side, "[u]pon transillumination the maxillary sinuses are dim. The left frontal sinus is also dim." (Id.) Initial Impression was: allergic rhinitis–specifically dust and molds, bowel dysbiosis, food allergies, nutritional deficiencies, probable hypothyroidism, sinusitis and history of TMJ and scoliosis. (TR. 258) For sinusitis, she was prescribed ceftin, fenesin, aestelin nasal spray, and rhinocort and was instructed to force fluids and use warm compresses. (Id.)

On February 7, 2002, Plaintiff returned to Dr. Kerry's office to report that she had completed a course of ceftin and that sinus head pain was returning. (TR. 258) She was also experiencing swelling in her thighs and ankles. (Id.) Dr. Kerry's physical examination denoted that Plaintiff's nose was congested; "[t]he right neck has a lymph node just above the left superior lobe of the thyroid"; the left thyroid was slightly swollen with a nodule also; "[w]e suspect these may be secondary to lymph adenopathy from the pharyngitis, which hasn't improved." (Id.) The next day, Dr. Kerry prescribed cipro upon receiving Plaintiff's phone call that avelox made her vomit. (Id.)

On February 26, 2002, Plaintiff reported to Margaret Dailey, a CRNP at Dr. Kerry's office, that her thyroid tests were within normal limits although the T4 was low. (TR. 257) Plaintiff exhibited typical hypothyroid symptoms such as cold intolerance, morning fatigue, forgetfulness, and coarse hair. (Id.) Plaintiff stated that she "spends a lot of time crying,"

and that she had moved out of her home into an apartment that had steam heat.  (Id.)  "We spent an extensive amount of time reviewing environmental exposures and also coping with the home that has a lot of formaldehyde in the compressed wood in the cupboards in the bed etc."  (Id.)  Plaintiff also reported that she was eliminating coffee, eggs, and dairy products from her diet.  (Id.) Plaintiff was prescribed cytomel and was also going to begin taking cal assimilate and magnesium complex.  (TR. 256-257)  She also continued to take zoloft, astelin, rhinocort, msm, digestazon, PB8.  (Id.)

In March 2002, Plaintiff was prescribed cipro and received an allergy injection.  (TR. 256)

On April 23, 2002, Plaintiff complained of a "marked reaction to her mold injections. They give her muscle aches for about 6-7 days...[t]hen she starts to react to many other mold exposures."  (Id.)  Although she moved from her home to a relatively mold free apartment, "outside exposure" to mold including going to friends' homes or restrooms "immediately precipitate muscle spasms."  (Id.)  She stated that she was unable to do math or construct a sentence when she was badly affected.  (Id.)  "She has been using .05 mold injections and still getting a 3-4 cm size reaction."  (Id.; *see also* TR. 254 ("She is having difficulty with her mold allergy treatment and getting big wheals..."))  A functional acuity contrast test, which is a contrast vision test,  showed that Plaintiff "has marked neuro-toxic evidence...." (TR. 255-256)  Dr. Kerry considered diluting Plaintiff's serum regarding mold "to see if she can tolerate it better..."  (TR. 254)  He noted Plaintiff had a yeast infection for which he prescribed diflucan.  (Id.)

The following day, Dr. Kerry "took her dust mold serum, which was already diluted 1:5....We then muscle tested her and found her reactive and non-reactive on every other bottle."  (Id.)  Dr. Kerry determined the appropriate therapeutic dosage for Plaintiff.  (Id.)

As of May 8, 2002, Plaintiff was "still having difficulty with her injections.  She had sinus swelling and the neck, back and hip muscles are tight due to the molds."  (TR. 253) Dr. Kerry suggested that Plaintiff consider traveling to the Southwest to be in the desert for

spring and summer.  (Id.)  "High altitude area in Arizona would be an ideal situation."  (Id.)
Plaintiff was continued on astelin,  heparin and PBZ were also prescribed.  (Id.)

By May 27, 2003, Plaintiff had been to Arizona and had returned to Pennsylvania for
a visit.  (TR. 251)  She reported to Dr. Kerry that she was already deteriorating with
headaches, sinus pain, postnasal drip, unclear thinking, neck pain, loss of bladder control,
joint and muscle pain, and fatigue.  (Id.)  She complained of a metallic taste.  (Id.)  Dr. Kerry
indicated that Plaintiff may want to consider a complete dental revision because she had
crowns and amalgam fillings.  (Id.)

d.    Chiropractic care

As noted by Doctors Cameron and Klein, while Plaintiff was in Pennsylvania, she was
treated by several chiropractors.

On January 6, 2004, John J. Honacki, D.C., of the Cranberry Chiropractic Clinic,
wrote that Plaintiff had been treated at the Clinic for five years beginning in 1985.  (TR. 322)
She presented with complaints of spinal pain, severe headaches, general muscular ache,
fatigue, and rosacea.  (Id.)  Physical examination and x-rays revealed scoliosis and multiple
vertebral subluxations.  (Id.)  Live cell microscopy and blood evaluation denoted "irregular
cellular shapes suggesting extensive free radical damage, further noted was the presence of
fungal/bacterial entity forms." (Id.)  Diagnosis included spinal sublaxation, spinal scoliosis,
chronic fatigue, fibromyalgia and musculoskeletal headaches.  (Id.)  During her treatment at
the Clinic, Plaintiff received spinal care; changed her diet; took vitamin, mineral, enzymatic,
and flora supplementation; attempted to reduce stress; and implemented aerobic exercise.
(Id.) Plaintiff's "conditions never totally resolved. Her ability to work was being jeopardized
and her quality of life was being adversely affected. Care had reached palliative/supportive
status with the possibility of definite permanent residuals.  It was Dr. Honacki's opinion
when he ceased treating Plaintiff that her "conditions were long standing and that at best
could be reduced in frequency and intensity, but not resolved."  (Id.)

- 18 -

Plaintiff also pursued chiropractic care in 1997 from Thomas D. Schoeffel, D.C.  (TR. 344)  In a January 13, 2004 letter, Dr. Schoeffel noted that on many occasions Plaintiff was unable to drive and her son had to take her to appointments.  (Id.)  "Even with Chiropractic manipulation Mrs. Hardt was only able to achieve moderate relief."  (Id.)

The record also contains treatment notes from Robert J. Vano, D.C., beginning September 10, 2001 when Plaintiff presented with neck and low back pain.  (TR. 335)  She reported that she suffered from a sore throat intermittently since February 2001, chest pain, nausea, and migraine headaches which occur once a month but had been getting worse and more common.  (Id.)  Plaintiff rated her neck pain as a 10 on scale from 1 to 10.  (TR. 337)  She rated her low back pain as 6.  (Id.)  Dr. Vano noted that Plaintiff appeared depressed, her left shoulder and left scapula were high; her right thoracic muscle and right lumbar muscle were tense; her right ilium was high; and her shoulders were rounded.  (Id.)  Upon palpation, he found trigger point sensitivity in the cervical, thoracic and lumbar regions, the right sacrum, left upper trapezius muscle, left and right suboccipital muscles, and left and right levator scapulae muscle; muscle spasm in the cervical, thoracic and lumbar regions and sacrum on the right; edema in the cervical region through the thoracic region; and aberrant motion in the cervical, thoracic and lumbar regions and limited range of motion in the same areas.  (TR. 335-336)  He also reviewed 1996 x-rays.  (TR. 324, 337)  Dr. Vano's assessment was cervical neuritis, cervical myofascitis, cervical segmental dysfunction, and lumbosacral segmental dysfunction.  (TR. 337)  Dr. Vano manipulated Plaintiff, developed a treatment plan, and opined that Plaintiff should respond favorably to conservative treatment but her progress would be compromised by the length of time the condition had existed prior to the latest episode.  (TR. 336-337)  Plaintiff saw Dr. Vano almost daily until October 1, 2001. (TR. 327-334)  During that time she reported continued lower back and mid back pain.  (Id.)  She also "seem[ed] to think that her bones are always 'slipping' out of position."  (TR. 327; *see also*  (TR. 329 ("Patient returned about 1 hour after leaving this visit and reported that

- 19 -

she feels that her upper neck is 'out of place.' Doctor examined cervical spine and found C1 to be misaligned...made correction, rechecked and found c-spine to be clear." ))

In a January 2, 2004 letter to Plaintiff, Dr. Vano wrote that range of muscle testing denoted significant deficiencies during the time he was treating her. (TR. 321) "How anyone could conclude you were faking the pain and muscle spasms is, in my opinion, impossible based upon the findings in this test. It simply shows the joint and muscle function at the moment and compares your test to measurements determined by...the American Medical Association...." (Id.)

In July 2002, Plaintiff was also treated by Lucy Rambacher at the Rambacher Chiropractic Clinic. (TR. 340-342) Records reflect Plaintiff's complaints concerning neck, back, knee, and muscle pain. (Id.)

### e.       Initial care in Arizona

Beginning in October 2002 through December 2002, after moving to Arizona, Plaintiff presented at the Sanders Chiropractic Clinic with complaints of a sore, stiff back, mid and upper back pain, and hip pain. (TR. 213-216) Plaintiff was assessed with muscle spasm and cervical, thoracic, and lumbar dysfunction. (Id.)

On December 31, 2002, Plaintiff presented at Sunsites Medical Center with complaints of a sinus infection and a rash on her trunk. (TR. 218) She was examined by Physicians Assistant Mick Drage who found she was remarkable for "bilateral boggy nasal turbinates with increased mucoid production" and  she was tender with palpation at the cervical spine perispinal musculature. (Id.)  His assessment was rhino-sinusitis, myofascial pain secondary to the sinusitis, pityriasis rosea. (Id.)  He prescribed allegra, flonase and lotrisone cream. (Id.)

On January 18, 2003, Plaintiff saw Reuben Wagelie, M.D. for "a problem commonly referred to as toxic mold syndrome....She has a plethora of symptoms but very little of them can be associated with an allergic respiratory or cutaneous problem." (TR. 222) Dr. Wagelie explained to her "that the methodology that we follow in diagnosing allergic problems is

different from what was done previously and it will not be feasible to continue the type of treatment that was given to her."  (Id.)

<u>f.      Dr. Gray</u>

In July 2003, Plaintiff started treatment with Michael R. Gray, M.D., M.P.H., C.I.M.E., in Arizona.  (*See* TR. 287) Plaintiff stated "that she is unable to work her nine-hour day teaching and no longer can run the vacuum and is limited to not more than one chore per day, such as running to the bank, grocery store, or on the van, or to a doctor's office.  She then comes home and is generally exhausted and fall asleep." (Id.)  Plaintiff's complaints included weakness, confusion, inability to concentrate, memory problems, low energy, "fatigue of an unusually intense nature", dizziness, nasal symptoms with discharge, muscle discomfort and spasm, joint discomfort, flushing of the skin, reduced bladder control, and insomnia all on a daily basis; headaches, lightheadedness, slurred words and difficulty finding words, poor appetite, watery eyes and nose, hoarseness, reduced cold tolerance, chest discomfort and pain, swelling of the ankles, breathing difficulties during sleep all several times per week; and numbness and tingling, shaking, muscle twitching, rapid pulse, palpitations, reflux, nausea, and vomiting at least once per month.  (TR. 287-288) Plaintiff's laboratory results showed that her general health profile was unremarkable; she exhibited markers "typically seen with mold-exposed patients"; she was also producing antibodies indicating that "she has been exposed to significantly increased levels...of these filamentous toxigenic structural molds.  In addition to this, she has clearly been exposed to the mycotoxins that they produce at an excessive degree"; and the existence of multiple neuro autoimmune antibodies was "objective evidence confirming the suspected presence of neurotoxicity consistent with the symptoms that she is reporting."   (TR. 288) He assessed healthcare maintenance; alopecia; status post toxigenic mold exposure initial onset somewhat uncertain; mycotoxicosis with confirmed: (1) immune toxicity and with features of mild hyperactiviation, significant suppression and significant autoimmune excess, (2) moderate small airways obstruction, and (3) toxic encephalopathy evidenced by symptoms and

multiple abnormal neuro autoimmune markers.  (TR. 287) Dr. Gray recommended multiple treatment approaches including: cholestyramine, itraconazole nasal spray and capsules, and CoQ10.  (TR. 288-289)

At a September 29, 2003 follow-up appointment, Plaintiff told Dr. Gray that she continued "to have problems fulfilling her duties...as a speech therapist and resource teacher. She is limited to completing one task per day because of her excessive fatigue and generalized discomfort and pain and malaise.  She has problems going to either the doctor, the grocery store, shopping or doing other things such as laundry."  (TR. 285) Additionally, "after 45 minutes of working on a computer, she ends up with significant fatigue, neck pain and eyes burning."  (TR. 286) Plaintiff also told Dr. Gray she had been seeing Dr. Sanders and Dr. Lusinski for treatments of muscle spasms, migraine headaches, and neck and spine discomfort.  (TR. 285)  Dr. Gray's findings remained unchanged from the previous visit except that he now included fibromyalgia in his assessment. (Id.)  Dr. Gray administered "trigger point injections, which seem[ed] to have some impact.  Her pain at the time of departure was at a 2/10, but she is extremely fatigued, she has been here all morning."  (TR. 286)

On October 16, 2003, Plaintiff told Dr. Gray that she could not stay awake more than four hours at a time before having to go back to sleep and that she was limited to one task per day after which she becomes very tired.  (TR. 306) On physical examination, Dr. Gray performed a "trigger point survey" which demonstrated "definite tenderness over the occipitals, trapezius, infraspinatus respiratory reflex site, sciatic, trochanteric, and L4-5 paraspinus muscle groups."  (Id.)  Dr. Gray's assessment remained unchanged from the previous visit.  (TR. 306)

At an October 31, 2003 follow-up visit, Plaintiff "looked fatigued."  (TR. 302) Her trigger points were positive at the occipitals, trapezius, infraspinatus respiratory reflex site, sciatic, trochanteric, and lumbar  paraspinus muscle groups.  (Id.) Plaintiff complained of continued pain, fatigue and weakness on daily basis.  (Id.)  She also stated that after using

a computer, she experiences increased aching of the head, spine, neck and popping of her

neck as well.  (TR. 302)  Dr. Gray administered trigger point injections.  (Id.) He noted that

because the injections provided "transient improvement,..." they were "clearly a maintenance

phenomenon and not a cure."  (TR. 301)  He also opined that:

> from the standpoint of levels of impairment and disability, she is significantly
> impacted as a result of her illness with regard to her inability to sit or stand
> longer than an hour, thinking clearly while reading, thinking clearly while
> doing simple arithmetic, remembering or following instructions, writing or
> typing for more than an hour, performing household chores such as washing
> windows, scrubbing floors, vacuuming or sweeping, carrying groceries of
> more than 15 pounds, which she tries to minimize and keep [sic] less than 3
> pounds.  She uses both her hands when she carries things.  Entering public
> places is problematic.  Walking short distances with any frequency or
> interacting with people are also problematic.

(TR. 302)

When Plaintiff saw Dr. Gray on November 13, 2003, his diagnoses remained the same

as on the previous visit.  (TR. 297) She reported having seen Dr. Laszkinski for neck, leg,

and back spasms.  (Id.)   Dr. Gray found that she continued to be:

> significantly impaired with regard to sitting or standing longer than an hour,
> thinking clearly while reading, thinking clearly while doing simple arithmetic,
> writing or typing for more than an hour, performing household chores such as
> washing windows, scrubbing floors, vacuuming or sweeping, carrying
> groceries of more than 15 pounds, entering public places, lifting 5-10 pounds
> with any frequency, or interacting with people.

(TR. 298) He noted that she was having difficulty because areas near the highway in her

community were being sprayed with pesticides.  (Id.)  Dr. Gray advised Plaintiff to obtain

a specific kind of air filter.  (TR. 299)

On December 19, 2003, Plaintiff told Dr. Gray that she had attempted to shop at

Sam's Club which caused her to become symptomatic and to have "major problems from

being exposed to volatile organic haptogenic, xenobiotic compounds...."  (TR. 311)   Dr.

Gray opined that Plaintiff:

> continues to be significantly impaired as a result of her mycotoxicosis with
> combined immune toxicity, toxic encephalopathy, and moderate small airways
> obstructive processes.  In particular, she has problems sitting or standing
> longer than an hour, thinking clearly while reading...[or] doing simple
> arithmetic, remembering or following instructions, writing or typing for more

than an hour, driving a car in heavy traffic, carrying groceries of more than 15 pounds, entering public places, walking short distances with any frequency, interacting with people, maintaining a regular work schedule or performing household chores such as washing windows, scrubbing floors, vacuuming or sweeping.

(TR. 313)

On January 21, 2004, Dr. Gray reconfirmed his diagnoses of

1. Mycotoxicosis with confirmed:
   a. Immune toxicity and with features of mild hyperactivitation, significant suppression and significant autoimmune excess.
   b. Moderate small airways obstruction.
   c. Toxic encephalopathy evidenced by symptoms, multiple abnormal neuro autoimmune markers, and neurophysiologic testing with QEEG and neuropsych abnormalities.
2. Fibromyalgia.
3. Status post toxigenic mold exposure, initial onset somewhat uncertain.
4. Alopecia.

(TR. 345) He stated that Plaintiff's

predominate symptoms include weakness, confusion, intense fatigue, dizziness, tinnitus, throat and sinus pain and nasal congestion. She is significantly impacted in her ability to sit, stand, think clearly and carry out fine manipulation. She is unable to enter public places for, at best, over two hours secondary to reactions from triggers such as carpet, mold, dust and perfumes, and other haptogenic xenobiotic compounds.

(Id.) He opined that Plaintiff's

environment must be strictly controlled, and the symptoms associated with the problems listed above prevent her from maintaining a regular schedule. I can state, to a reasonable medical certainty and probability, that Mrs. Hardt would not be able to sustain gainful employment; she has not been able to work since at least the date of her first appointment with me on 07/18/03. Given her history and understanding the deteriorating nature of her condition, I would agree that she has been unable to work since September 2001. Mrs. Hardt's prognosis remains poor.

(TR. 345-346) Dr. Gray based his findings on

• a July 18, 2003 breathing test demonstrating "moderate small airways obstruction.
  Her forced expiratory flow rate when she got 75% of her air out of her lungs (FEF75)
  was 62.8% the predicted value. It was increased by 13% after use of the
  bronchodilator."

- 24 -

- demonstration on physical examination of "multiple objective trigger points to be tender consistent with and confirmatory of fibromyalgia."

- An EEG performed by Dr. Crago showing significant abnormalities.

- Laboratory tests denoted; "multiple abnormal neuro autoimmune markers. In addition, her immunosciences panel tells me that she has been exposed to significantly increased levels of mold.

(TR. 345)

On April 14, 2004, Dr. Gray included "rhinosinusitis controlled with itraconazole spray", in his assessment. (TR. 362) He also commented upon examining physician Jerome Rothbaum's March 2004 findings.[5] (TR. 363) Dr. Gray indicated that according to Plaintiff, Dr. Rothbaum "did not audit her trigger points. She says that he did touch her muscles very, very minimally and lightly, but did not, in fact, go trigger point by trigger point and palpate them directly. She said that at the time she saw him that her neck was quite tight and stiff and this raises the question of the validity of the trigger point survey." (TR. 363) Dr. Gray further noted that his examinations of Plaintiff revealed "positive trigger points in excess of 11/18 with zero distracter points and she did meet the requirements and qualifications for fibromyalgia." (TR. 363-364) Dr. Gray also took issue with Dr. Rothbaum's claim that "mycotoxicosis is 'certainly not a generally accepted medical diagnosis.'" (TR. 364) According to Dr. Gray, "the national and international literature..,clearly recognized that exposure to mixed mold and their associated mycotoxins in the context of bioaerosol contaminated indoor air environments is associated with multiple system illness and while this has been published in the past by Dr. Eckard Johanning, Andrew Campbell, Kaye Kilburn and Wayne Gordon as well as others, it is clear that from Dr. Rothbaum's statements that he is simply not familiar with the literature." (Id.) Dr. Gray further pointed out that Dr.

_____

[5]Plaintiff was examined by Dr. Rothbaum on March 12, 2004 upon the request of the ALJ. (TR. 347-350) His evaluation is summarized *infra* at pp. 28-29.

Rothbaum's pulmonary function testing "does not have any specific parameters that actually isolate the small airways and that he [sic] FEF25/75% is clearly looking at the intermediate airways and the FEF 75% is not being reported.  In the testing that we have performed she has shown small airways obstruction and this finding is simply missed by the use of an insensitive pulmonary function system."  (Id.)  Dr. Gray confirmed his previous diagnoses. (Id.)

During Dr. Gray's treatment, Plaintiff took cytomel, astelin spray, probiotics, valium, diphenhydramine, guaifenex, itraconazole, progesterone, various essential oils, and colloidal silver nasal drops.

g. B. Robert Crago, Ph.D.

On October 3, 2003, Plaintiff saw B. Robert Crago, Ph.D., of Neurobehavorial Health Services, on referral from Dr. Gray for psychophysiological evaluation.  (TR. 290-296) On cognitive testing (Wechsler Adult Intelligence Scale (hereinafter "WAIS") and Integrated Visual and Auditory Continuous Performance Test (hereinafter "IVA CPT")), Plaintiff's IQ fell in the superior-to-very-superior range.  (TR. 293) However, subtest analysis on the WAIS demonstrated that she had "relative deficits and/or only average abilities in mathematics, measures of short term memory, sequencing, visual motor learning, non-verbal reasoning and visual scanning."  (TR. 294) She also showed significant deficits "and/or a very poor score on a measure of visual construction."  (Id.)  On the IVA CPT, Plaintiff was found to be "operating in the low average to average range which is far lower than her estimated superior range of intelligence and cognitive abilities."  (Id.)  Thus, although Plaintiff's "verbal abilities are primarily intact, she shows relative deficits, that is performing only in the average range on many measures of non-verbal intelligence, working memory, and attentional skills."  (TR. 296)

Plaintiff's "conventional EEG" test results were within normal limits.  (TR. 295) However, "[q]uantative and neurometeric analysis" denoted "significant abnormalities of clinical interest" including that the prefrontal areas of the cortex were noted to be operating

- 26 -

with decreased cortical efficiency.[6]  (Id.)  "This finding is consistent with some of the results of the neuropsychological testing which demonstrated decreased attention skills."  (Id.) Additionally, "[s]ignificantly deviant quantitative scores were also noted primarily involving the right hemisphere....These findings would be consistent with the results of the neuropsychological testing" which showed relatively significant deficits in non-verbal intelligence. (Id.)

Dr. Crago recommended that Plaintiff continue with appropriate medical care, rehabilitation efforts including stress management and psychotherapy aimed at helping her address losses of health, family, work, financial security, and ability to maintain a home, and to make proper adaptations to current limitation.  (TR. 296) He also recommended "EEG operant conditioning techniques" to remediate central nervous system dysfunction.  (Id.)

On December 31, 2003, Dr. Crago completed a disability evaluation concerning Plaintiff.  (TR. 314)  Based upon Plaintiff's October 3, 2003 test results, he opined that she:

> currently presents as disabled due to the combination of her physical, cognitive and emotional difficulties. Intellectually she shows significant relative deficits but by themselves, her cognitive deficits are not totally disabling.  Her primary problems cognitively have to do with an inability to maintain her attention or concentration for extended periods of time.  She would also be unable to perform activities within a schedule, maintain regular attendance or be punctual, and deal with customer intolerances due to a combination of her physical, cognitive and emotional difficulties.

(Id.) He noted that although Plaintiff was "not mentally ill in regards to disability...she does suffer from significant psychological symptoms of anxiety and depression secondary to multiple losses she has sustained in her life and her chronic medical problems."  (TR. 315) He also found that her symptoms prevented her from completing a normal workday; '[h]er activities of daily living are restricted; although she is capable of self-care."  (Id.)  According to Dr. Crago, Plaintiff's "chemical hyperactivity" limited her ability to function in a normal

---

[6]"The frontal areas of the cortex are responsible for 'executive functions' including the control and modulation of attention, mood, and generation of higher level concepts and problem-solving."  (TR. 295)

manner and she should avoid exposure to exhaust fumes, perfume, detergents, "sick buildings", and other common environmental stressors. (Id.) He further opined that Plaintiff was not malingering and that she had a solid work and social history "before developing health problems secondary to toxic exposure. She is working hard at this point to try to find appropriate rehabilitation" regarding her medical condition. (Id.) "Prognosis at this time would be considered guarded given that her problems constitute an area of medicine that is in its infancy. In my opinion she is disabled and will most likely remain so in the foreseeable future. If Ms. Hardt is awarded benefits I believe she is capable of managing them." (Id.)

Dr. Crago completed a Mental Residual Functional Capacity Assessment indicating that Plaintiff was markedly limited in her ability to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. (TR. 317-318) He indicated that Plaintiff was moderately limited in her ability to understand and remember detailed instructions, and to accept instructions and respond appropriately to criticism from supervisors. (Id.)

### 2.    State-Agency Physician

#### a.    Examining Physicians

##### (1.)    Physical

On March 12, 2004, Jerome Rothbaum, M.D., examined Plaintiff at the behest of the ALJ. (TR. 347-359)   In addition to describing her symptoms, Plaintiff also told Dr. Rothbaum that she often wears a mask when she goes to the store. (TR. 347) "She believes she is capable of walking a half mile at times. She does do stretching on a daily basis. On an average day, she gets up, makes something for herself to eat, then takes a bath,...sits outside for a while...", naps several times a day, and goes to bed about 7:30 p.m. (TR. 348)

Dr. Rothbaum's examination denoted "evidence suggesting allergic rhinitis." (TR. 350) He also found

> features that are suggestive of fibromyalgia...for example, the cognitive impairment, depression, and the fatigue.  However, she does not have the typical trigger point abnormalities...It is abundantly clear that the claimant has marked somatization, affective abnormalities, and her total symptomatology [sic] is probably a consequence largely of this problem in conjunction with what may very well be a fibromyalgia-like syndrome.

(Id.) Dr. Rothbaum also found evidence of moderate scoliosis. (TR. 349) Pulmonary testing was "compatible with a minimal obstructive defect with improvement following inhaled bronchodilator." (TR. 350) He noted that Dr. Gray's diagnosis of mycotoxicosis is "certainly not a generally accepted medical diagnosis." (Id.) Dr. Rothbaum's impression was allergic rhinitis, bronchospastic lung disease, "[f]ibromyalgia-like syndrome (with entities of depression, fatigue, and cognitive impairment)", scoliosis, and serous otitis, left ear. (TR. 349-350)

Dr. Rothbaum completed a Medical Source Statement of Ability To Do Work-Related Activities (Physical) wherein he indicated that Plaintiff could lift up to 35 pounds occasionally and 15 pounds frequently; no limitations with regard to standing, walking or sitting; and Plaintiff could occasionally balance, kneel, crouch, crawl, stoop, and climb ramps, stairs, ladders, ropes or scaffolds. (TR. 351-352) Dr. Rothbaum based lifting limitations on Plaintiff's "subjective, self stated history of easy fatigue and weakness." (TR. 351) He also found that Plaintiff's exposure to dust, humidity, wetness, fumes, odors, chemicals, and gases should be limited because she "has very mild bronchospastic lung disease–exposure...may exacerbate her resp. [and] nasal symptomalogy [sic]." (TR. 354)

<u>(2.)   Mental</u>

On March 5, 2003, Edward K. Lovejoy, Ph.D., performed a Mental Status Examination. (Tr. 231) Before the examination, Plaintiff informed Dr. Lovejoy's secretary that she needed to step outside for some air because she "was getting 'light headed and couldn't breathe' due to the chemicals in the building." (TR. 232) She told Dr. Lovejoy that

"[i]n mold or buildings like this I have a two hour window, then I get light headed and can't breathe." (Id.) When discussing her depression, she told Dr. Lovejoy that she was "anxious, tearful, sometimes angry...Why would I leave my home and a $50,000 job to live in Sunsites, Arizona. If I was to run away, why not go to Palm Springs...?" (TR. 233) She also stated that since moving to Arizona she had been "attempting to 'heal herself' with alternative medicines including aroma therapy, essential oils, message, special diet, and chiropractic therapy." (TR. 232) She stopped taking zoloft soon after moving to Arizona "and that she feels somewhat better although she is sensitive to changes in weather conditions, and chemicals in buildings." (Id.)

Dr. Lovejoy opined that although Plaintiff exhibited symptoms of depression, "the more significant presenting problem appears to be a combination of medical symptoms. While it is unclear if the claimant actually has a multi-chemical sensitivity, clearly the claimant's fixation on her perceived symptoms has compromised her ability to remain at her work as a speech therapist, and to live at her home with her husband in Pennsylvania. (TR. 235) Dr. Lovejoy's diagnosis was depressive disorder nos, rule out hypochondriasis, obsessive and dramatic personality features, and multiple somatic complaints. (Id.)

### b.    Non-examining Physicians

### (1.)    Physical

On February 6, 2003, Frank A. Shallenberger, Jr., M.D., completed a Physical Residual Functional Capacity Assessment of Plaintiff. (TR. 223-230) He opined that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; stand and/or walk about six hours in an eight hour workday[7]; sit about six hours in an eight hour workday; push and pull without limitation; occasionally climb ramps and stairs, balance, stoop, kneel, crouch,

---

[7]Dr. Shallenberger also specified that Plaintiff "must take the usual breaks. The claimant may stand/walk slightly more than six hours. The six hours spent standing/walking should not be consecutive but should be broken into shorter periods of time never to exceed sixty (60) minutes at any one time during the eight hour work day." (TR. 224)

and crawl. (TR. 222-225)  He also concluded that Plaintiff could never climb ropes, ladders or scaffolds.  (TR. 225) She had no manipulative limitations.  (TR. 226) Plaintiff should avoid concentrated exposure to humidity.  (TR. 227) Because of Plaintiff's "allegations of chemical, dust, and mold sensitivities" Dr. Shallenberger advised that she " avoid even moderate exposure" to "fumes, odors, dusts, gases, poor ventilation, etc."  (TR. 227)  Dr. Shallenberger commented that Plaintiff's allegations seemed "to be exaggerated and not supported by the findings of our local allergists.  She appears to be only partially credible at best."  (TR. 228) He found no medical evidence of record to support Plaintiff's allegations that she was unable to work.  (TR. 229)

On July 9, 2003 a consultant, whose name is illegible, completed a Residual Functional Capacity Assessment which was identical to Dr. Shallenberger's except in the following areas: Plaintiff could stand and/or walk for six hours in an eight hour workday with normal breaks; in addition to avoiding concentrated exposure to humidity and moderate exposure to "fumes, odors, dusts, gasses, poor ventilation, etc.,", Plaintiff should also avoid concentrated exposure to hazards such as machinery, heights, etc,,    (TR. 263-267) The consultant indicated that the findings were based on Plaintiff's multiple chemical and mold sensitivities.  (TR. 268) The consultant found Plaintiff to be "partially credible."  (Id.)

<u>(2.)    Mental</u>

On March 17, 2003, Paul Tangeman, Ph.D., completed a Psychiatric Review Technique wherein he indicated that Plaintiff suffered from "affective disorders [d]epression nos" but that the impairment was not severe.  (TR. 236) He found that Plaintiff's depression resulted in mild restriction of activities of daily living, social functioning, and maintaining concentration, persistence or pace.  (TR. 246) He opined that Plaintiff's depression was secondary to her general medical condition, that she maintains adequate social skills, her cognition is intact, her memory is adequate, and she is independently able to carry out activities of daily living.  (TR. 248) Although he thought possible hypochrondrasis was suggested, there was no history of such a diagnosis nor were there current records to support

a psychosomatic condition.  (TR. 249) He indicated that his findings were consistent with "partial support" of Plaintiff's allegations.  (Id.)

On July 10, 2003, Ronald G. Nathan, M.D., also competed a Psychiatric Review Technique wherein he diagnosed "affective disorders"–dysthymia. (TR. 271, 274) Like Dr. Tangeman, Dr. Nathan found that Plaintiff's impairment was not severe and caused only mild restrictions.  (TR. 271, 281) Dr. Nathan indicated that Plaintiff had documented mold allergies; that Plaintiff's diagnosed "medical conditions...could account for her" symptoms; and that one consultant suggested "'[f]unctional' overlay." (TR. 283)  Although the medical record was consistent with Plaintiff's allegations of depression, there was no support for a finding of cognitive defects.  (Id.)

C.      Lay Testimony

Plaintiff submitted letters from her sisters, a former co-worker, and a friend describing Plaintiff's inability to function because of her symptoms.  (TR. 127, 129, 130, 319)

D.      Journal Articles

The record also contains journal articles concerning mold sensitivity and mycotoxins.

E.      The ALJ's Findings

1.      Claim Evaluation

SSA regulations require the ALJ to evaluate disability claims pursuant to a five-step sequential process.  20 CFR §§404.1520, 416.920; *Baxter v. Sullivan,* 923 F.2d 1391, 1395 (9th Cir. 1991).  The first step requires a determination of whether the claimant is engaged in substantial gainful activity.  20 CFR §§ 404.1520(b), 416.920(b).  If so, then the claimant is not disabled under the Act and benefits are denied.  *Id.*  If the claimant is not engaged in substantial gainful activity, the ALJ then proceeds to step two which requires a determination of whether the claimant has a medically severe impairment or combination of impairments. 20 CFR §§ 404.1520(c)), 416.920(c)).  In making a determination at step two, the ALJ uses medical evidence to consider whether the claimant's impairment more than minimally limited

or restricted his or her physical or mental ability to do basic work activities. *Id*. If the ALJ concludes that the impairment is not severe, the claim is denied. *Id*. If the ALJ makes a finding of severity, the ALJ proceeds to step three which requires a determination of whether the impairment meets or equals one of several listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 CFR §§ 404.1520(d), 416.920(d); 20 CFR Pt. 404, Subpt. P, App.1. If the claimant's impairment meets or equals one of the listed impairments, then the claimant is presumed to be disabled and no further inquiry is necessary. If a decision cannot be made based on the claimant's then current work activity or on medical facts alone because the claimant's impairment does not meet or equal a listed impairment, then evaluation proceeds to the fourth step. The fourth step requires the ALJ to consider whether the claimant has sufficient residual functional capacity ("RFC")[8] to perform past work. 20 CFR §§ 404.1520(e), 416.920(e). If the ALJ concludes that the claimant has RFC to perform past work, then the claim is denied. *Id*. However, if the claimant cannot perform any past work due to a severe impairment, then the ALJ must move to the fifth step, which requires consideration of the claimant's RFC to perform other substantial gainful work in the national economy in view of claimant's age, education, and work experience. 20 CFR §§ 404.1520(f). 416.920(f). At step five, in determining whether the claimant retained the ability to perform other work, the ALJ may refer to Medical Vocational Guidelines ("grids") promulgated by the SSA. *Desrosiers v. Secretary,* 846 F.2d 573, 576-577 (9th Cir. 1988). The grids are a valid basis for denying claims where they accurately describe the claimant's abilities and limitations. *Heckler v. Campbell,* 461 U.S. 458, 462, n.5 (1983). However, because the grids are based on exertional or strength factors, where the claimant has significant nonexertional limitations, the grids do not apply. *Penny v. Sullivan,* 2 F.3d 953, 958-959 (9th Cir. 1993); *Reddick v.*

---

[8]Residual functional capacity is defined as that which an individual can still do despite his or her limitations. 20 CFR § 404.1545, 20 CFR 416§945.

*Chater,* 157 F.3d 715, 729 (9th Cir. 1998). Where the grids do not apply,  the ALJ must use

a vocational expert in making a determination at step five.  *Desrosiers,* 846 F.2d at 580.

> 2.     The ALJ's Decision

In his June 18, 2004 Decision, the ALJ made the following findings:

1.     The claimant has not engaged in substantial gainful activity since the alleged onset date.

2.     The claimant met the disability insured status requirements of the Act on September 7, 2001, the date claimant stated she became unable to work, and continued to meet them as of [sic] date of this decision.

3.     The medical evidence establishes that the claimant has these severe medically determinable impairments: fibromyalgia-like syndrome; somatization disorder; allergic rhinitis; and mold and chemical sensitivity.

4.     Claimant does not have an impairment or combination of impairments listed in, or medically equal to one listed in 20 CFR 404, Appendix 1, Subpart P.

5.     The claimant has an underlying medically determinable impairment that could possibly cause some pain or other symptoms, but claimant's allegations with regard to the severity and functional consequences of the symptoms are not fully credible.  (SSR 96-7p)

6.     The claimant has the residual functional capacity to perform light work (20 CFR 404.1545).  Claimant has the ability to lift/carry 20 pounds occasionally, 10 pounds frequently, stand and/or walk 6 hours with breaks during an eight hour workday, and sit continuously with breaks every two hours for 6 hours in an eight hour workday.  She must work in an environment free of fumes, chemicals, mold, dust, humidity, and other airborne irritants.

7.     The claimant's impairments do not preclude performance of her past relevant work as certified speech pathologist and teacher.

8.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 [sic] 404.1520(e)).

## DECISION

It is the decision of the Administrative Law Judge that, based upon the applications filed effective August 30, 2002, the claimant is not entitled to a period of disability or disability insurance benefits under Sections  216(i) and 223, respectively, of the Social Security Act.

(TR. 28-29)

The ALJ also found that Plaintiff's depression was not a severe impairment expected to last twelve months. (TR. 24)

In reaching his decision, the ALJ found that Plaintiff's allegations concerning the severity and functional consequences of her symptoms were not fully credible. (TR. 26-27) He, therefore, discounted treating Dr. Gray's opinion because Dr. Gray relied to a great deal on Plaintiff's "less than credible subjective complaints." (TR. 27) He also discounted Dr. Gray's opinion because Dr. Gray's "diagnoses...are not generally accepted in the medical community" and his opinion was "inconsistent with [Plaintiff's] actual activity level." (Id.) The ALJ also rejected treating Dr. Kerry's opinion that Plaintiff could not return to her past relevant work because Dr. Kerry did not provide an explanation for that opinion. (TR. 27-28)

The ALJ accorded "substantial persuasive weight" to the opinions of examining physicians Lovejoy and Rothbaum "as the best available knowledge and evaluation of [Plaintiff's] impairments and the degree to which these impairments would hamper her in the performance of job related tasks and duties." (Id.) The ALJ indicated that the examining physicians' examinations were thorough and well-supported by rationale and findings. (Id.) The ALJ further gave significant weight to the opinions of the State agency physicians which he found were supported by and consistent with the evidence of record. (Id.)

The ALJ determined that Plaintiff's past relevant work as a certified speech pathologist and teacher as described by Plaintiff was at the light exertional level. (Id.) According to the ALJ, "[t]he traditional school environment would certainly be free of fumes, dust, and humidity." (Id.)

### 3.    Appeals Council

In denying Plaintiff's request to reverse the ALJ's decision, the Appeals Council noted that Plaintiff's earnings posted in 2002 and 2003 "strongly suggest gainful activity (SGA) after the date you allege an inability to work. Although the [ALJ] did not find SGA

after the date you allege an inability to work, the other findings are supported by substantial evidence."  (TR. 7; *see also* TR. 12)

## III.    ARGUMENT

Plaintiff contends that the ALJ erred when he accorded more weight to the opinions of the examining physicians instead of her treating physicians.  She also challenges his finding that her allegations of pain and limitations from her impairments were not fully credible.

Defendant argues that the ALJ properly rejected the opinions of Plaintiff's treating physicians and that there was no error in rejecting Plaintiff's credibility.

## IV.    STANDARD OF REVIEW

An individual is entitled to Title XVI Supplemental Security Income disability benefits (hereinafter "SSI") if he or she meets certain eligibility requirements and demonstrates the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  "'A claimant will be found disabled only if the impairment is so severe that, considering age, education, and work experience, that person cannot engage in any other kind of substantial gainful work which exists in the national economy.'"  *Penny,* 2 F.3d at 956 (*quoting Marcia v. Sullivan,* 900 F.2d 172, 174 (9th Cir. 1990)).

To establish a *prima facie* case of disability, the claimant must demonstrate an inability to perform his or her former work. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984).  Once the claimant meets that burden, the Commissioner must come forward with substantial evidence establishing that the claimant is not disabled.  *Fife v. Heckler*, 767 F.2d 1427, 1429 (9th Cir. 1985).

The findings of the Commissioner are conclusive and courts may overturn the decision to deny benefits "only if it is not supported by substantial evidence or it is based on

legal error." *Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir. 1992)(citations omitted). Therefore, the Commissioner's determination that a claimant is not disabled must be upheld if the Commissioner applied the proper legal standards and if the record as a whole contains substantial evidence to support the decision. *Clem v. Sullivan*, 894 F.2d 328, 330 (9th Cir. 1990) (citing *Desrosiers*, 846 F.2d at 575-76; *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983)). Substantial evidence is defined as such relevant evidence which a reasonable mind might accept as adequate to support a conclusion. *Jamerson v. Chater,* 112 F.3d 1064, 1067-68 (9th Cir. 1997); *Winans v. Bowen,* 853 F.2d 643, 644 (9th Cir. 1988). However, substantial evidence is less than a preponderance. *Matney,* 981 F.2d at 1019.

The Commissioner, not the court, is charged with the duty to weigh the evidence, resolve material conflicts in the evidence and determine the case accordingly. *Id.* However, when applying the substantial evidence standard, the court should not mechanically accept the Commissioner's findings but should review the record critically and thoroughly. *Day v. Weinberger*, 522 F.2d 1154 (9th Cir. 1975). Reviewing courts must consider the evidence that supports as well as detracts from the examiner's conclusion. *Id*. at 1156.

In evaluating evidence to determine whether a claimant is disabled, the opinions of treating physicians are entitled to great weight. *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir. 1989). However, even a treating physician's opinion is not necessarily conclusive on either the issue of a physical condition or the ultimate issue of disability. *Id.* When resolving a conflict between the opinion of a treating physician and that of an examining or nonexamining physician, the opinion of the treating physician is entitled to greater weight and may be rejected only on the basis of findings setting forth specific legitimate reasons based on substantial evidence of record. *Magallanes,* 881 F.2d at 751. Moreover, the Commissioner may reject the treating physician's uncontradicted opinion as long as the Commissioner sets forth clear and convincing reasons for doing so. *Magallanes*, 881 F.2d at 751.

Further, when medical reports are inconclusive, questions of credibility and resolution of conflicts in the testimony are functions solely of the Commissioner. *Magallanes,* 881 F.2d at 751 (citations omitted). However, the Commissioner's finding that a claimant is less than credible must have some support in the record. *See Light v. Social Security Administration,* 119 F.3d 789 (9th Cir. 1997); *Connett v. Barnhart,* 340 F.3d 871 (9th Cir. 2003).

V.    DISCUSSION

The ALJ found that Plaintiff suffered from severe impairments including fibromyalgia-like syndrome; somatization disorder; allergic rhinitis; and mold and chemical sensitivity but that these impairments did not render Plaintiff disabled under the Act. (TR. 28) The ALJ's non-disability decision was based upon his rejection of Plaintiff's credibility and the rejection of opinions from Plaintiff's treating physicians in favor of opinions from examining and non-examining physicians. However, as set forth below, the ALJ failed to provide legally sufficient reasons for rejecting Plaintiff's credibility and for rejecting the opinions of her treating physicians. The ALJ also failed to provide legally sufficient reasons for disregarding lay testimony.

A.    Plaintiff's Credibility

"An ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment." *Orn v. Astrue,* __ F.3d __, 2007 WL 2034287 (9th Cir. July 16, 2007) (internal quotation marks and citation omitted). However, where, as here, the claimant has produced objective medical evidence of an underlying impairment that could reasonably give rise to the symptoms and there is no affirmative finding of malingering by the ALJ, the ALJ's reasons for rejecting the claimant's symptom testimony must be clear and convincing. *Id.; Robbins v. Soc. Sec. Admin.,* 466 F.3d 880, 883 (9th Cir. 2006). Additionally, "[t]he ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion." *Smolen v. Chater,* 80 F.3d 1273, 1284 (9th Cir. 1996); *see also Orn,* __ F.3d __,  2007 WL 2034287 (the ALJ must provide specific and cogent reasons for the disbelief and cite the reasons why the testimony is unpersuasive). In assessing the claimant's

- 38 -

credibility, the ALJ may consider ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements about the symptoms, and other testimony from the claimant that appears less than candid; unexplained or inadequately explained failure to seek or follow a prescribed course of treatment; the claimant's daily activities; the claimant's work record; observations of treating and examining physicians and other third parties; precipitating and aggravating factors; and functional restrictions caused by the symptoms. *Smolen,* 80 F.3d at 1284. *See also Robbins,* 466 F.3d at 884 ("To find the claimant not credible, the ALJ must rely either on reasons unrelated to the subjective testimony (e.g., reputation for dishonesty), on conflicts between his testimony and his own conduct; or internal contradictions in that testimony.")

The ALJ found that although Plaintiff had "an underlying medically determinable impairment that could possibly produce some pain or other symptoms..." , her allegations concerning the severity and functional consequences of her symptoms exceeded the limitations reasonably expected from the medical findings. (TR. 26) Significantly, among the severe impairments found by the ALJ was fibromyalgia-like syndrome. Fibromyalgia "causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments and other tissues." *Benecke v. Barnhart,* 379 F.3d 587, 590 (9th Cir. 2004) (citations omitted). Common symptoms of fibromyalgia, which Plaintiff herein also experiences, includes chronic diffuse pain throughout the body; multiple tender points[9];

---

[9]In 1999, treating Dr. Pfoff opined that Plaintiff's "[c]hronic recurrent pain in the upper extremities, fits most with a fibromyalgia-type picture, although she doesn't have a classic distribution of pressure points." (TR. 174) Dr. Gray indicated that Plaintiff demonstrated multiple positive trigger points consistent with fibromyalgia. (TR. 306-307, 345, 363-364; *see also* TR. 302 (positive trigger point survey)) Dr. Gray administered trigger point injections which provided "transient" relief. (TR. 286, 301) Although examining Dr. Rothbaum denoted that Plaintiff did not exhibit trigger points, he found "features that are suggestive of fibromyalgia, as for example, the cognitive impairment, depression and the fatigue. (TR. 350) Plaintiff reported to Dr. Gray that Dr. Rothbaum did not palpate the trigger point areas. (TR. 363)

irritable bowel and/or bladder; sensitivity to weather changes, temperature or stress and activity level; chronic fatigue; stiffness; and sleep disturbance. *Id.; Willis v. Callahan,* 979 F.Supp. 1299, 1303 n, 2 (D. Or. 1997). "Fibromyalgia's cause is unknown, there is no cure, and it is poorly-understood within much of the medical community." *Benecke,* 379 F.3d at 590. *See also Sarchet v. Chater,* 78 F.3d 305. 306 (7th Cir. 1996) (fibromyalgia is "a common, but elusive and mysterious disease...") Fibromyalgia "is diagnosed entirely on the basis of patients' reports of pain and other symptoms." *Benecke,* 379 F.3d at 590. Although "[t]he American College of Rheumatology issued a set of agreed upon diagnostic criteria in 1990,...there are no laboratory tests to confirm the diagnosis." *Id.*

The ALJ's failure to provide legally sufficient reasons for rejecting Plaintiff's credibility arises to a large extent from his apparent misunderstanding of fibromyalgia as well as the interplay of Plaintiff's fibromyalgia symptoms with the other severe impairments identified by the ALJ. To discredit Plaintiff's testimony that "she is unable to work due to fatigue, confusion, low back pain radiating to the hands and legs, chest pain, shortness of breath and dizziness", the ALJ cited a lack of objective findings to support such claims, Plaintiff's noncompliance with the medical regimen specified by her physicians, and her ability to engage in activities which the ALJ found indicative of a significant degree of overall functioning. (TR. 26-27)

### 1.      Objective Findings

The ALJ stated that Plaintiff's "treating and examining physicians consistently characterized the impairments as 'minimal', 'mild', 'slight', 'normal', and 'unremarkable' with reference to the *objective* clinical and laboratory findings, which seems quite disproportionate to the severity of pain claimant has alleged." (TR. 26) (emphasis in original) He also cited "indications from claimant's examining physicians that there was an element of somatization in her symptoms. Her symptoms were out of proportion to the objective findings." (Id.) He further found that Plaintiff did not demonstrate weight loss, diffuse atrophy or muscle

wasting which, according to the ALJ, are "common side effects of prolonged and/or chronic pervasive pain."  (TR. 27)

The ALJ noted that upon complaints of chest pain, Plaintiff's stress test was "normal"; blood tests denoted a normal sed rate, negative RA factor and ANA; "[a]fter complaints of dysphagia, an esophagram was normal"[10]; and an MRI of Plaintiff's brain was "unremarkable."  (TR. 24)[11]

"While subjective pain testimony cannot be rejected solely on the ground that it is not fully corroborated by medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and disabling effects."  *Rollins v. Massanari,* 261 F3d. 853, 857 (9th Cir. 2001) (*citing* 20 CFR § 404.1529(c)(2)).  However, with regard to Plaintiff's fibromyalgia, the ALJ erred in "effectively requir[ing] 'objective evidence for a disease that eludes such measurement.'  *Green-Younger v. Barnhart,* 335 F.3d 99, 108 (2d Cir. 2003) (reversing and remanding for an award of benefits where the plaintiff was disabled by fibromyalgia)."  *Benecke,* 379 F.3d at 594.  *See also Rogers v. Comm'r. of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007) (rejecting ALJ's credibility finding where, *inter alia,* the ALJ cited lack of objective medical evidence and that Plaintiff exhibited normal reflexes and normal sensory testing because "the nature of fibromyalgia itself renders...over-emphasis upon objective findings inappropriate.") (*citing Canfield v. Comm'r. of Soc. Sec.,* 2002 WL

[10]The ALJ did not mention that testing concerning Plaintiff's esophagus showed that Plaintiff's esophagus was slightly displaced to the left thus indicating that pills did become lodged creating Plaintiff's symptoms.  (TR. 157, 161)

[11]Defendant also points out that treating Dr. Klein indicated that Plaintiff's condition was "stable" and that examining Dr. Rothbaum opined that Plaintiff's lung impairment was "very mild."  (Defendant's XMSJ, pp. 4-5 (citing TR. 175-211, 354))  Defendant is correct that Dr. Klein indicated on more than one occasion that Plaintiff was "stable."  That Plaintiff was stable does not detract from Dr. Klein's opinion that her condition remained "unimproved", she remained unable to work, and treatment was only of a "palliative nature." (TR. 310) As to Dr. Rothbaum's finding, treating Dr. Gray pointed out that Dr. Rothbaum's pulmonary function testing did not isolate the small airways and instead only focused on the intermediate airways.  (TR. 364)

- 41 -

31235758 (E.D. Mich. Sept. 13, 2002) (it would be "nonsensical to discount a fibromyalgia claimant's subjective complaints of pain based upon lack of objective medical evidence, as such evidence is generally lacking with fibromyalgia patients."); *Sarchet,* 78 F.3d at 307 (recognizing that the absence of objective evidence of fibromyalgia such as swelling of the joints "is no more indicative that the patient's fibromyalgia is not disabling than the absence of headache is an indication that a patient's prostate cancer is not advanced."); *Swaim v. Comm'r of Soc. Sec.,* 297 F.Supp.2d 986, 991, 994 (N.D. Ohio 2003) (because "fibromyalgia defies diagnosis by objective clinical, diagnostic, or laboratory findings", the ALJ's assessment of the plaintiff's credibility "placed undue emphasis on the absence of objective medical evidence."). Given that no objective tests can conclusively confirm the disease, the lack of abnormal tests does not undermine Plaintiff's credibility. "Rather, these negative findings simply confirm a diagnosis of fibromyalgia by a process of exclusion, eliminating 'other medical conditions....'" *Green-Younger,* 335 F.3d at 109 (citation omitted).

In addition to fibromyalgia-like syndrome and other impairments, the ALJ found that Plaintiff also suffered from severe somatization disorder, which he suggested rendered her symptoms out of proportion to the objective findings. (TR. 28) The ALJ is correct that examining Dr. Lovejoy noted that although Plaintiff was depressed, "the more significant presenting problem appears to be a combination of medical symptoms and the claimant's difficulty coping with her somatic concern and physical symptoms...clearly the claimant's fixation on her perceived symptoms has compromised her ability to remain at work as a speech therapist, and to live at home with her husband in Pennsylvania." (TR. 235) Somatization disorder is "a condition in which a patient's perceived physical problems are of a psychological origin." *Benecke,* 379 F.3d at 592.

While Plaintiff's somatization disorder may factor into assessment of her subjective testimony, the fact remains that the ALJ required objective evidence to support the severity of fibromyalgia symptoms which cannot be measured objectively. The record supports the

conclusion that Plaintiff's testimony accurately reflects her symptoms and resulting functional limitations with regard to all the severe impairments found by the ALJ.

Likewise, the ALJ's reference to Plaintiff's lack of weight loss, diffuse atrophy or muscle wasting does little to undermine Plaintiff's credibility. No physician of record indicated that these side effects would necessarily accompany Plaintiff's impairments. Defendant is correct that the Ninth Circuit has affirmed a denial of benefits where, *inter alia,* the plaintiff alleged she had to maintain a fetal position all day because of constant pain but she exhibited no physical signs including muscle atrophy of a totally incapacitated person. (Defendant's XMSJ, p. 6 *(citing Meanel v. Apfel,* 172 F.3d 1111, 1114 (9th Cir. 1999)). Although the record herein reflects Plaintiff's June 2003 statement that she slept 20 out of 24 hours, Plaintiff's case is distinguishable from *Meanel.* Plaintiff regularly went to physical therapy, regularly received chiropractic and osteopathic manipulation throughout the time period at issue, and followed a home stretching program. Arguably, these treatments and therapies forestalled diffuse atrophy and/or muscle wasting. Additionally, Plaintiff's description of her daily activities indicates that, unlike the *Meanel* plaintiff, she is not totally incapacitated. Plaintiff naps on and off throughout the day; on good days she prepares some meals; and she is able to do a minimal amount of walking. There is no basis on this record to disbelieve Plaintiff because she did not exhibit signs of diffuse atrophy or muscle wasting.

As to the ALJ's finding that Plaintiff did not lose weight, in 1999, Plaintiff stated that she gained 10 pounds which she attributed to luvox. (TR. 173) However, the record reflects a 17 pound weight loss between 2000 (TR. 172 (121.5 pounds) and 2004 (TR. 363 (104.5 pounds)) In July 2001, a few months after the amended onset date, Plaintiff weighed 118 pounds. (TR. 168) The ALJ does not explain why Plaintiff's 14 to 17 pound weight loss of record was not acceptable evidence of weight loss to support her pain allegations. Moreover, and more importantly, the record herein does not support the conclusion that Plaintiff's impairments would have resulted in greater, or any, weight loss whatsoever.

By focusing on the objective medical evidence, the ALJ overlooked the lengthy and frequent course of medical treatment, the nature and extent of that treatment, the numerous medications Plaintiff was prescribed, and the reasons for which they were prescribed. *See Rogers,* 486 F.3d at 248. Throughout treatment by Doctors Pfoff (who noted in 1999 that Plaintiff's complaints "fit most with a fibromyalgia type picture...") (TR. 174), Dr. Cameron, Dr. Klein, Dr. Kerry, Dr. Gray, numerous chiropractors, and Dr. Crago, – from 1999 through 2004– Plaintiff consistently described debilitating fatigue, pain and stiffness, flaring of pain associated with increased work activity, muscle spasm, allergic reactions to her surroundings (i.e., mold and chemical sensitivity), depression, confusion, difficulty with bladder control, and nasal and sinus problems including sinusitis. Plaintiff also described similar symptoms to examining Doctors Lovejoy and Rothbaum. Consequently, given the nature of Plaintiff's impairments, any lack of "objective findings" in proportion to the alleged severity of Plaintiff's symptoms does not constitute clear and convincing evidence discounting Plaintiff's subjective testimony of disability.

2.    Medication

The ALJ stated that "[t]here are numerous references in the medical evidence which are indicative of claimant's non-compliance with the medical regimen specified by her physicians....Claimant's noncompliance does not support the alleged intensity and duration of pain and subjective complaints."   (TR. 26) The ALJ did not cite to any one of the "numerous references."   Any failure on Plaintiff's behalf to consistently comply with a prescribed medical regimen is not readily apparent in the record. Plaintiff did indicate on one occasion to Dr. Cameron that she only took the flurbiprofen prescribed by Dr. Pfoff at night because "it makes her sleepy...", she switched from amerge back to imitrex for migraines because the imitrex worked better, (TR. 173) Dr. Kerry prescribed cipro in place of avelox when Plaintiff reported adverse reaction to the avelox  (TR. 258); she stopped taking cholestyramine because of swelling in her ankles (TR. 313); and she suspended "charcoal because Dr. Lacinski was worried about rapid detox." (Id.) The ALJ may not "rely on the

claimants's failure to take pain medication where evidence suggests that the claimant had a good reason for not taking medication." *Fair v. Bowen,* 885 F.2d 597, 602 (9th Cir. 1989). Dr. Cameron also noted that Plaintiff was not "too kean [sic] on traditional medicine." (TR. 164) Nonetheless, the record is replete with references dating from 1999 reflecting Plaintiff's prescription drug regimen including anti-inflammatory medications, painkillers, antidepressants, antibiotics for sinusitis, migraine medications, and nasal sprays. Plaintiff also consistently went to physical therapy; followed a home stretching program; used a stimulator unit for pain and muscle spasms; underwent chiropractic and osteopathic manipulation; tried acupuncture on Dr. Cameron's suggestion; wore a sacral-support orthosis belt; worked on her breathing pattern daily at home; and underwent trigger point injections and allergy shots. Plaintiff submitted to medical testing ordered by her doctors. She changed her diet. She took a variety of supplements recommended by health care providers. She moved out of her home in Pennsylvania and eventually moved to a different state on Dr. Kerry's suggestion that she may feel better living in the desert. Dr. Klein noted on more than one occasion that Plaintiff remained "highly motivated." (TR. 189, 196, 200)

Plaintiff consistently sought treatment for her symptoms. Numerous doctors offered a myriad of treatment recommendations and medications.[12] Plaintiff's "constant quest for medical treatment and pain relief refutes...a finding" that she lacked credibility about pain and physical limitations. *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001). Contrary to the ALJ's finding, the substantial evidence of record supports the conclusion that Plaintiff fulfilled the vast majority of medical instructions and recommendations.

---

[12] Non-treating, non-examining Dr. Shallenberger dismissed Plaintiff's symptoms and her compliance with the prescribed regimen when noting: "The claimant indicates she gets 'dizzy' but she is taking: zoloft, flexaril, diazepam, allegra and tylenol with codeine #3. That is enough to make anyone 'dizzy.'" (TR. 134)

<u>3.    Plaintiff's Activities</u>

The ALJ cited Plaintiff's statements that she is able to "cook, shop, do laundry, wash dishes; is able to get out and take walks, drive an automobile, visit friends/relatives, talk on the phone, and requires no assistance in dressing or in personal grooming."  (TR. 27) He pointed out that "a considerable amount of time is spent watching television and/or reading. She was capable of taking a 12-day trip to Germany in August 2002."  (Id.)  Consequently, the ALJ "inferred that [Plaintiff] has maintained a somewhat normal level of daily activity and interaction."  (Id.)  He also noted that the mental and physical requirements of her household tasks and social interactions were consistent with a significant degree of overall functioning.  (Id.)

The Ninth Circuit has "repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability.  One does not need to be 'utterly incapacitated' in order to be disabled." *Vertigan,* 260 F.3d at 1050 (*quoting Fair,* 885 F.2d at 603); *see also Vick v. Comm'r of Soc. Sec.,* 57 F.Supp.2d 1077, 1086 (D. Or. 1999) ("If a claimant's activity is in harmony with her disability, the activity does not necessarily indicate an ability to work.") "Engaging in activities including household chores is not necessarily inconsistent with a finding of disability."  *Vick,* 57 F.Supp.2d at 1085. The question is whether the plaintiff spends a "'substantial part of his [or her] day engaged in pursuits involving the performance of physical functions that are transferrable to a work setting...' Thus, if a claimant is capable of performing activities including household chores, 'that involve many of the same physical tasks as a particular type of job, it would not be farfetched for an ALJ to conclude that the claimant's pain does not prevent the claimant from working.'" *Id.* at 1085-1086 (*quoting Fair,* 885 F.2d at 603) (emphasis in original).  *See also Rollins,* 261 F.3d at 857 (affirming ALJ's finding that fibromyalgia plaintiff's allegations of disabling pain were undermined by activities such as attending to the needs of two young children, cooking, housekeeping, laundry and leaving

the house daily to go to her son's school and after school activities, doctor's appointments and the grocery store); *Vertigan,* 260 at F.3d. 1049 ("if a claimant 'is able to spend a *substantial* part of [her] day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations.") (emphasis in original). However, certain activities such as swimming or limited walking "are not necessarily transferrable to the work setting with regard to the impact of pain.  A patient may do these activities *despite* pain for therapeutic reasons, but that does not mean she could concentrate on work despite the pain or engage in similar activity for a longer period given the pain involved." *Vertigan,*  260 F.3d at 1049 (emphasis in original).  *See also Fair,* 885 F.2d at 603 ("[M]any home activities are not easily transferable to what may be the more grueling environment of the work place....").

        Plaintiff's regular activities and lifestyle do not conflict with her claims of disability because she testified that pain and fatigue severely limited those daily activities. Specifically, Plaintiff stated soon after onset she was no longer able to care for her son, husband and dog and that the responsibility for cooking, doing dishes, shopping, caring for the dog, and driving Plaintiff to the doctor's office fell to her son.  (TR. 98-99, 614)  Upon living on her own in Arizona, Plaintiff stated that even though she makes her own meals, some days she is "strong enough...to prepare food other days it is soup and yogurt" (TR. 505); her washer and dryer are located next to each other and when she does laundry she "take[s] two pieces of wet laundry at a time and put [sic] in the dryer" (Id); the walks she takes are only for short distances (TR. 620); she has a driver's license[13] but she does not trust her judgment to drive after having been involved in two car accidents (TR. 604, 609-610); regarding visits, sometimes a neighbor or a little boy visit Plaintiff (TR. 604); when traveling

_____

        [13]In her MSJ, Plaintiff indicates that she has a license for identification purposes. (Plaintiff's MSJ, attachment, p.2)

to the store and shopping, she wears a prescription charcoal mask and can only spend 20 minutes in the store because mold and/or chemicals begin to affect her (TR. 108, 347, 505). Her statements in the record consistently include complaints of severe fatigue.  As for her 12-day trip to Germany in 2002, Plaintiff states that the trip was led by teachers, was purchased two years in advance, and while in Germany, she received medical treatment.  (TR. 505; Plaintiff's MSJ, attachment  p.2) Plaintiff's assertion that she received medical treatment is supported by Dr. Klein's notation that in Germany Plaintiff received chiropractic treatment and medication that "sounds like a combination of a nonsteroidal anti[-] inflammatory...with muscle relaxant."  (TR. 176)     Nothing in the record about Plaintiff's trip translates into support for the finding that Plaintiff's activities are consistent with a significant degree of overall functioning.   Plaintiff's restricted activities and the physical effects of their performance are consistent with fibromyalgia, allergies including mold and chemical sensitivities.  *See Reddick,* 157 F.3d at 722 (ALJ's finding that claimant's activities indicated an ability to work was unsupported by the record where such activities were fully consistent with her underlying impairment of chronic fatigue syndrome)

Plaintiff has ceased doing many of her previous activities such as gardening, skiing, jogging, and going to church. She does not drive. She only leaves her home for short periods. She has  essentially sequestered herself from her family and former friends and professional community.  She removed the carpeting from her home in Arizona.  Her "efforts to avoid irritating substances, also speaks to the depth of her allergies" and mold and chemical sensitivity. *Kouril v. Bowen,* 912 F.2d 971, 975-976 (9th Cir. 1990) (where plaintiff suffered from allergies and chemical sensitivity "[t]oo many relevant details...[about plaintiff's living situation and statements qualifying plaintiff's ability to cook, clean, socialize and drive] must be ignored to conclude that" she lacked credibility and was not disabled).

"In sum, while credibility determinations regarding subjective complaints rest with the ALJ, those determinations must be reasonable and supported by substantial evidence."

*Rogers,* 486 F.3d at 249. For the reasons stated above, consideration of the record as a whole supports the conclusion the ALJ erred in discounting Plaintiff's credibility.

      B.     Treating Physicians

Dr. Klein determined that Plaintiff was unable to continue working as a speech pathologist. The ALJ did not discount this finding.

When Dr. Kerry, who recommended that Plaintiff move to the Southwest hoping to improve her allergies and mold sensitivity, saw Plaintiff after she had moved to Arizona, he opined that Plaintiff "continues to be disabled for her occupation....it appears that it will be impossible for her to work in this area due to the prevalent mold environment." (TR. 251) The ALJ stated that Dr. Kerry did not provide the rationale for such opinion. (TR. 25) Dr. Kerry's records documented Plaintiff's allergic rhinitis, sinusitis, physical reaction to allergy injections, and complaints of physical discomfort that he attributed to her allergies including mold sensitivity. The rationale for Dr. Kerry's opinion is clearly reflected within his opinion that Plaintiff was unable to continue in her former occupation, i.e., that she could not work in a setting that triggered her allergies/sensitivity. (*See* TR. 251) The ALJ's finding that Plaintiff "must work in an environment free of fumes, chemicals, mold, dust, humidity and other airborne irritants" is consistent with Dr. Kerry's opinion. (TR. 28)

Dr. Gray identified work restrictions which would render Plaintiff disabled under the Act. The ALJ did not give Dr. Gray's opinion "significant weight due to being based on diagnoses which are not generally accepted in the medical community. Furthermore, Dr. Gray appears to rely to a great deal on claimant's less than credible subjective complaints" and his opinion "[is] inconsistent with claimant's actual activity level." (TR. 27)

The ALJ must set out specific and legitimate reasons for rejecting Dr. Gray's functional limitations which render Plaintiff disabled under the Act. *See Reddick,* 157 F.3d at 725 ("A treating physician's opinion on disability, even if controverted, can be rejected only with specific and legitimate reasons supported by substantial evidence in the record.") The ALJ did not adopt the residual functional capacity recommended by examining Dr.

Rothbaum.  Instead, the functional limitations adopted by the ALJ were consistent with the recommendations of the non-examining doctors and were stricter than those recommended by Dr. Rothbaum.[14]  (*See* TR. 224, 264, 351) Nothing in the non-examining doctors' opinions indicate that they considered Plaintiff's fibromyalgia when assessing her residual functional activity.  (*See* TR. 228 ("The claimant's allegations seem to be exagerated [sic] and not supported by the findings of our local allergists."); TR. 263-268 (citing multiple chemical and mold sensitivities as support for indicated limitations)).

Although the ALJ "considered" Dr. Gray's opinion, he did not give that opinion "significant weight due to being based on diagnoses which are not generally accepted in the medical community."  (TR. 27)  When controlling weight is not given to the treating physician's opinion, the regulations instruct the ALJ "to consider the factors listed in section 404.1527(d)(2)-(6) in determining what weight to accord the opinion of the treating physician.  Even when contradicted by an opinion of an examining physician that constitutes substantial evidence, the treating physician's opinion is 'still entitled to deference.'" *Orn,* __ F.3d __, 2007 WL 2034287 (quoting SSR 96-2p at 4).  Thus, in some cases a treating physician's opinion will be entitled to the greatest weight and should be adopted even if that opinion does not meet the test for controlling weight.  *Id.*  (attributing greater weight to treating physicians' opinion than to examining physician's opinion) Determination of the proper weight to afford Dr. Gray's opinion requires consideration of the following factors: (1)  the frequency of examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the treating doctor's opinion; (3) the consistency of the opinion and the record as a whole; (4) whether the opinion is from a specialist; and (5) other factors that would support the opinion.  20 CFR § 404.1527(d)(2)-(6).

---

[14]With regard to environmental limitations, the ALJ's finding that Plaintiff "must work in an environment free of fumes, chemicals, mold, dust, humidity, and other airborne irritants" (TR. 28) is more restrictive than the recommendations of the examining and non-examining physicians.

Dr. Gray began treating Plaintiff after her arrival in Arizona in July 2003 and saw her on a regular basis through the date of the ALJ's decision.  (*See* TR. 287 (August 2003 supplement to July 2003 notes); TR. 285 (September 29, 2003); TR. 306 (October 16, 2003); TR. 301 (October 31, 2003); TR. 297 (November 2003); TR. 311 (December 2003); TR. 345 (January 2004); TR. 362 (April 2004)).   In detailed treatment notes, he documented Plaintiff's test results, the findings of his physical examinations, Plaintiff's reports about her symptoms, his observations of same, and Plaintiff's responses to various medications, supplements and treatments.  He prescribed an array of medications, made recommendations concerning air filters, and administered trigger point injections.  The frequency and nature of Dr. Gray's treatment merits weight.

The ALJ's proffered reason for not attributing significant weight to Dr. Gray's opinion because his "diagnoses...are not generally accepted in the medical community" (TR. 27) is considered herein under factor number two, i.e.,the support for that opinion.  While examining Dr. Rothbaum asserted that treating Dr. Gray's diagnosis of mycotoxicosis  was "certainly not a generally accepted medical diagnosis" (TR. 350), there is nothing in the record to suggest that Dr. Gray's diagnosis of fibromyalgia is not a generally accepted medical diagnosis.  Dr. Rothbaum diagnosed fibromyalgia-like syndrome.  (TR. 349) The ALJ concluded that Plaintiff suffered from the severe impairment of fibromyalgia-like syndrome.  (TR. 28) *See also Benecke,* 379 F.3d at 589-590 (recognizing the impairment of fibromyalgia).

Any question concerning whether the diagnosis of mycotoxicosis is "generally accepted" is of no moment under the instant circumstances.  The test results and other findings that led Dr. Gray to his conclusion confirm Plaintiff's mold and/or chemical sensitivity.  The ALJ concluded that substantial evidence in the record supported the finding that Plaintiff suffers from severe medically determinable impairments including "mold and chemical sensitivity."   (TR. 28) Whether Plaintiff's impairment is referred to as mycotoxicosis or mold and chemical sensitivity, the ALJ's finding that Plaintiff suffered

- 51 -

from mold and chemical sensitivity is entirely consistent with Dr. Gray's opinion that Plaintiff is severely impaired by mold and other chemicals.

Dr. Gray's determination that Plaintiff's impairments included mold and chemical sensitivity and fibromyalgia was supported by laboratory testing and physical examination. (*See e.g.,* TR. 288 (tests indicated Plaintiff's mold sensitivity); TR. 302, 307 (examination indicated positive trigger point examination); TR. 363-364 (plaintiff exhibited 11 out of 18 trigger points and discussing results of Plaintiff's pulmonary function testing)). Dr. Gray based his disability finding on Plaintiff's impairments including: mycotoxicosis, fibromyalgia, and status post toxigenic mold exposure. (TR. 345-346)

The consistency of Dr. Gray's reports merits additional weight as well. "Consistency does not require similarity in findings over time despite a claimant's evolving medical status." *Orn,* __ F.3d __, 2007 WL 2034287. Instead, the opinions must be consistent with the record as a whole. *Id.* Dr. Gray's diagnosis was consistent with treating Dr. Kerry's opinion that Plaintiff was unable to work due to mold and chemical sensitivities. Dr. Klein found that Plaintiff was unable to work as September 2001 due to her "chronic intractable musculoskeletal impairment..." (TR. 310; *see also* (TR. 175 (Dr. Klein referring to Plaintiff's "generalized stiffness and myalgias...")) Dr. Gray's opinion is consistent with the medical record as a whole.

Whether Dr. Gray is a specialist is not apparent on the record nor have the parties pointed to any other factors that would tend to support or contradict Dr. Gray's opinion. Therefore, the last two factors for consideration under section 404.1527(d)(2) through (6) have no bearing on the instant analysis. However, the first three factors support the conclusion that Dr. Gray's opinion was entitled to more weight than accorded by the ALJ.

The ALJ also discounted Dr. Gray's opinion because it appeared "to rely a great deal on claimant's less than credible subjective complaints." (TR. 27) Because the ALJ improperly discredited Plaintiff's subjective complaints, *see supra* at pp. 38-49, the ALJ's rejection of Dr. Gray's opinion for relying in part on Plaintiff's subjective symptoms and

complaints is no longer valid.  Further, that Dr. Gray to some extent relied on Plaintiff's "subjective complaints hardly undermines his opinion as to her functional limitations: as '[a] patient's report of complaints or history, is an essential diagnostic tool.'" *Green-Younger,* 335 F.3d at 107 (involving fibromyalgia) (*quoting Flanery v. Chater,* 112 F.3d 346, 350 (8th Cir. 1997)).  Herein, Plaintiff's subjective symptoms were to a large extent relevant to the medical diagnosis. *See e.g. Reddick,* 157 F.3d at 726 (disagreeing with ALJ's rejection of physician's opinion for relying on subjective complaints because chronic fatigue syndrome is primarily evaluated on the basis of plaintiff's subjective complaints). In addition to considering results of physical and laboratory testing and Plaintiff's subjective complaints, Dr. Gray himself also observed Plaintiff's fatigue: "...she is extremely fatigued, she has been here all morning."  (TR. 286; *see also* TR. 302 (noting that Plaintiff "looked fatigued"))  Nor are Plaintiff's daily activities as she described them inconsistent with Dr. Gray's conclusions.[15]

The ALJ failed to set out specific and legitimate reasons supported by substantial evidence to reject Dr. Gray's opinion.  The ALJ having failed to provide "legally sufficient reasons for rejecting" Dr. Gray's disability finding, that opinion is credited as true. *Benecke,* 379 F.3d at 593; *see also Lester v. Chater,* 81 F.3d 821, 834 (9th Cir. 1995).

C.     Lay Testimony

Plaintiff submitted letters from her sisters, a co-worker and a friends describing the effects of Plaintiff's impairments on her daily life.  (TR. 127, 129-130, 319) For example, Plaintiff's sister Dorothy Morgan described how "[a]n hour of vacuuming the house could send her to bed with muscle pains in her back and neck as well as a debilitating migraine that would make her nauseous...Sometimes it would pass within a day and sometimes it would be several days before Marilyn could function normally again."  (TR. 127) Ms. Morgan also

_____

[15]The ALJ rejected Dr. Crago's opinion because it was inconsistent with Plaintiff's activity level.  (TR. 27) Just as the ALJ's finding is in error with regard to Dr. Gray so is it in error for rejection of Dr. Crago's opinion as well.

related how Plaintiff's fatigue caused her to "sit down most of the time" and prevented her from coming down to dinner at family gatherings. (Id.) Plaintiff's sister Susan Morgan wrote that she drove her sister to appointments because Plaintiff was unable to drive, "some days, simple daily activities were no longer possible for her to complete such as cooking. She couldn't remember things....Organization [sic] skills were increasingly more difficult for her." (TR. 129) Other letters described Plaintiff's constant absences from work and Plaintiff's breathing difficulty while shopping which required her to immediately leave the store. (TR. 130, 319)

Generally, lay testimony making a medical diagnosis or vocational assessment is "beyond the competence of lay witnesses and do[es] not constitute competent evidence" requiring consideration by the ALJ. *Nguyen v. Chater,* 100 F.3d 1462, 1467 (9th Cir. 1996) (*citing Vincent v. Heckler,* 739 F.2d 1393, 1395 (9th Cir. 1984)). However, "[l]ay testimony as to a claimant's *symptoms* is competent evidence which the [ALJ] must take into account...unless he expressly determines to disregard such testimony, in which case 'he must give reasons that are germane to each witness.'" *Id.* (*quoting Dodrill v. Shalala,* 12 F.3d 915, 919 (1993)) (emphasis in original). *See also Robbins,* 466 F.3d at 885 (The Ninth Circuit has "never found harmless an ALJ's silent disregard of lay testimony about how an impairment limits a claimant's ability to work.") The lay statements included information about Plaintiff's symptoms which the ALJ did not address as required.

D.    Inconsistent Finding

The ALJ found that Plaintiff "must work in an environment free of fumes, chemicals, mold, dust, humidity and other airborne irritants." (TR. 28) However, when determining that Plaintiff could return to her past work the ALJ concluded that "[t]he traditional school environment would certainly be free of fumes, dust and humidity." (Id.) It must be assumed that the ALJ's failure to mention whether Plaintiff would encounter mold or other airborne irritants in the traditional school environment was an oversight given that he found she could

- 54 -

return to work in such a location notwithstanding his determination that she "must work in an environment free of" such irritants.  (Id.)

E.    Conclusion

Plaintiff requests that the Court remand the matter for an immediate award of benefits. Remand for an award of benefits is appropriate where:

> (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Benecke* , 379 F.3d at 593.   Where the test is met, "we will not remand solely to allow the ALJ to make specific findings...Rather we take the relevant testimony to be established as true and remand for an award of benefits." *Id*. (citations omitted); *see also Lester,* 81 F.3d at 834.

As discussed above, the ALJ failed to set forth legally sufficient reasons for rejecting Dr. Gray's opinion and Plaintiff's credibility, both of which the Court credits as true.  *See Benecke,* 379 F.3d at 593.  The record is complete and there are no outstanding issues that must be resolved before a disability finding can be made.[16]  Further, it has been over four years since Plaintiff applied for benefits.  The Ninth Circuit has recognized that "[r]emanding a disability claim for further proceedings can delay much needed income for claimants who are unable to work and are entitled to benefits, often subjecting them to 'tremendous financial difficulties while awaiting the outcome of their appeals and proceedings on remand.'" *Benecke,* 379 F.3d at 595 (*quoting Varney v. Secretary of Health and Human Services,* 859

---

[16]When denying Plaintiff's request to reopen and change the ALJ's decision, the Appeals Council noted that Plaintiff's earnings after the date of onset date "strongly suggest substantial gainful activity after the..." alleged onset date.  (TR. 7)  Plaintiff received a stipend during a portion of medical leave.  Reference to the stipend does not change the analysis given that neither the Appeals Council nor the "ALJ found s[ubstantial] g[ainful] a[ctivity] after Plaintiff's alleged onset date.  (TR. 7)

F.2d 1396, 1398 (9th Cir. 1988)); *see also Terry v. Sullivan,* 903 F.2d 1273 (9th Cir. 1990) (remanding for an award of benefits where the plaintiff applied almost four years prior); *Erickson v. Shalala,* 9 F.3d 813 (9th Cir. 1993) (remanding for an award of benefits where plaintiff, who was disabled under the Act, "has been waiting for well over four years for his disability benefits").

Because the ALJ failed to provide adequate reasons for rejecting the opinion of Plaintiff's treating physician and Plaintiff's credibility, and because Plaintiff has satisfied all three factors in favor of remand for an award of benefits, remanding for further administrative proceedings concerning this period "would serve no useful purpose and would unnecessarily extend [Plaintiff's] long wait for benefits." *Benecke*, 379 F.3d at 595 (remanding where the ALJ failed to make sufficient findings regarding Plaintiff's credibility). *See also Regennitter v. Commissioner,* 166 F.3d 1294, 1300 (9th Cir. 1999) (where the court "conclude[s] that...a doctor's opinion should have been credited and, if credited, would have led to a finding of eligibility, we may order the payment of benefits."); *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir.1990) (remanding for payment of benefits where the Secretary did not provide adequate reasons for disregarding examining physician's opinion); *Winans,* 853 F.2d at 647 (same).   Therefore, Plaintiff's Motion for Summary Judgment should be granted and this matter should be remanded for an award of benefits.

## VI.   RECOMMENDATION

For the foregoing reasons,  the Magistrate Judge recommends  that the District Court:

(1)      grant Plaintiff's Motion for Summary Judgment (Doc. No.12 );

(2)      deny Defendant's Cross-Motion for Summary Judgment (Doc. No.15 ); and

(3)      remand this matter for an award of benefits.

Pursuant to 28 U.S.C. §636(b), any party may serve and file written objections within ten days after being served with a copy of this Report and Recommendation. If objections are filed, the parties should use the following case number:  CV 05-167-TUC-CKJ.  A party

- 56 -

may respond to another party's objections within ten days after being served with a copy thereof.  *See* Fed.R.Civ.P. 72(b).

If objections are not timely filed, then the parties' right to *de novo* review by the District Court may be deemed waived.  *See United States v. Reyna-Tapia,* 328 F.3d 1114, 1121 (9th Cir.) (*en banc*), *cert. denied,* 540 U.S. 900 (2003).

DATED this 17th day of September, 2007.


_____
Héctor C. Estrada
United States Magistrate Judge

- 57 -